351 So.2d 1050 (1977)
FORD MOTOR COMPANY, a Foreign Corporation, Doing Business in the State of Florida, Appellant,
v.
Sandra HAVLICK et al., Appellees.
Nos. 75-2046, 75-2071.
District Court of Appeal of Florida, Fourth District.
April 7, 1977.
Rehearing Denied June 27, 1977.
Adams, Sullivan, Coogler & Watson, West Palm Beach, and Sam Daniels, Miami, for appellant.
William M. Hicks of Colson & Hicks, Miami, and Robert Orseck of Podhurst, Orseck & Parks, P.A., Miami, for appellees.
PER CURIAM.
Affirmed.
DAUKSCH, J., and SCHWARTZ, ALAN R., Associate Judge, concur.
LETTS, J., dissents.
LETTS, Judge, dissenting.
This case resulted in a judgment for the plaintiff in the sum of $1,740,000.00, she being badly burned when her car erupted in flames after receiving a rear end collision in excess of forty miles per hour on I-95.
I have no quarrel with any of the instructions to the jury, save one, which reads:
Implicit in the duty of a manufacturer of a potentially dangerous commodity to warn of the dangers in its use, is the duty to warn with a degree of intensity that would cause a reasonable man to exercise, for his own safety, precaution commensurate with the potential danger.
There can be only one interpretation of such an instruction, and that is, without regard to reasonableness or negligence, if a manufacturer produces (1) a potentially *1051 dangerous commodity and (2) fails to warn, then said manufacturer incurs absolute liability for injury. No one, not even an unreasonable man, would deny that an automobile is a "potentially dangerous commodity," and in this case, the manufacturer issued no warning.
Said instruction cited as its source, Tampa Drug Company v. Wait, 103 So.2d 603 (Fla. 1958); however, in said Tampa Drug decision, the court was dealing with a colorless floor cleaning fluid (unusually concentrated carbon tetrachloride) which the court correctly labeled "LATENTLY dangerous." (emphasis supplied). By contrast, an automobile, with the lone exception of a firearm, is probably the most PATENTLY dangerous product in the marketplace.
Moreover, this instruction would have been improper in any event, even if the appellee's injuries had been caused by carbon tetrachloride, because in the Tampa Drug case, the Supreme Court, while employing the precise wording used in the instruction now under discussion, surrounded it with explanations to the effect that the manufacturer's duty was only to take "reasonable precautions" and "reasonabl[y] foresee injury." No such qualifying language was included in the above quoted instruction and its absence was prejudicial.
The appellee, in defending the instruction, points out that it was likewise surrounded by other qualifying instructions defining negligent conduct, reasonable fitness and the like; however, the appellee's argument that to view it alone is to take it "out of context reading" is not acceptable to me. If my opinion that the jury must read this instruction alone, seems inconsistent with my preceding remarks about the Tampa Drug instruction, let me say that I am not unmindful of the general rule which provides that a charge is to be considered as a whole and that a judgment will not be reversed because one paragraph or phrase standing alone is defective, if the instruction, as a series, correctly states the law. Edwards v. Poe, 203 So.2d 188 (Fla. 2nd DCA 1967); however, such a general rule does not apply where two instructions are in conflict and one is clearly erroneous and prejudicial, that is, where the error consists, not of an omission of some material fact but, of an affirmative statement by the court which, when considered with the other instructions, might tend to confuse the jury. In such a situation, it will not be presumed that the jury only followed the correct instructions. Edwards v. Poe, supra. In the final analysis, the decision must turn on whether or not there was a reasonable possibility that the jury could have been misled. Ruiz v. Cold Storage and Insulation Contractors, Inc., 306 So.2d 153 (Fla.1st DCA 1975).
In my view, it is more than likely that the jury was confused and misled in the case now before us. The instruction given, went further than it should have on the question of products liability and even far exceeded the doctrine of strict liability, which latter has not as yet even been accepted in so called second collision cases in Florida.[1] The leading case in our state in Ford Motor Company v. Evancho, 327 So.2d 201 (Fla. 1976), which laid down the rule that the liability of a manufacturer for negligent design, in second collision cases, is predicated on a duty of reasonable care based only on common law negligence and not on warranty or strict liability. In so holding, the court adopted the Larsen Rule set forth in Larsen v. General Motors Corporation, 391 F.2d 495 (8th Cir.1968). It is significant that the Larsen case, so adopted by our Supreme Court, had this to say about any duty to warn:
The failure to use reasonable care in design or knowledge of a defective design, gives rise to the reasonable duty on the manufacturer to warn of this condition. Id. at 505.
This is a far cry from the instruction given in the case now before us, where the warning had to be given, no matter what.
*1052 Being of the opinion that the instruction was improper, it is appropriate to consider whether the negligence of Ford Motor Company was so apparent and the evidence so preponderant that with, or without, the erroneous instruction, the result would have been the same and the jury neither confused nor misled. I have done so, and the evidence of negligence is far from convincing.
The alleged negligence in this case centered on: (1) the fact that the state of the art in designing other economy compact cars had not been followed by Ford, (2) that the gas tank had been placed under the trunk and too near the rear bumper, instead of in the trunk, and (3) that Ford knew from conducted tests of the unreasonable danger from fire in a Pinto.
To illustrate the "state of the art" in other compact "economy" cars, the appellees chose the gas tank design for Mercedes Benz, Toyota, Volvo, Audi, Fiat, Capri, Peugeot, and Studebaker Avanti. From this choice, two factors are only too apparent to anyone. First, most of these are luxury expensive cars that, only in fuel consumption, compare with the "economy" Pinto. Second, all of them, save one expensive specialty model, represent a state of the art practiced outside the United States of America. One is left in considerable doubt, therefore, that the Ford Pinto's economy design would, by comparison, constitute negligence in the mind of the jury.
Concerning the actual location of the gas tank, here again the evidence was not unequivocal, and became a typical battle of the experts, with Ford's witnesses claiming the location suggested by the appellee's witnesses would actually be more dangerous. What is clear from the record is that the graphically shocking photographs of the wrecked automobile show almost total destruction from the front seat backwards, and it is quite probable that a jury could have concluded it made no difference whether the tank was in the trunk or under it, in that there is, literally, no trunk remaining. As an ironic twist, the Fifth Circuit reversed a directed verdict in favor of Ford in which the opinion specifically cited testimony of an expert who claimed he would never design a car calling for the gas tank to be put in the trunk. Blitzstein v. Ford Motor Company, 288 F.2d 738 (5th Cir.1961).
As to the tests, these were conducted by Ford in October of 1970, after the 1971 models were already on the market, so that a design defect, if indeed the tests were conclusive of such, might very well not be imputed to Ford by a jury, before the tests took place.
The appellee was horribly injured and, against such a solvent defendant, it is not hard to understand why the jury would find for her, given any opportunity, such as the erroneous instruction. Absent such an instruction, it would appear that any juror knows full well that he or she is more likely to be horribly injured or killed in any high speed collision while driving a small cheap car, rather than a Mercedes Benz, and that all serious accidents, involving the internal combustion engine, carry with them the sinister threat of fire. This variation in safety standard, depending on the vehicle, was discussed in Dreisonstok v. Volkswagenwerk, 489 F.2d 1066 (4th Cir.1974) where the court ruled that a passenger in a Volkswagen had no right to expect the manufacturer to make it "crashworthy" at 40 miles per hour. The same case went on to say that one could expect a Cadillac to be more crashworthy than an economy car and also cited Dyson v. General Motors Corporation, 298 F. Supp. 1064 (D.C.Pa. 1969), a case which followed the Larsen Rule that Florida has now adopted in Evancho, supra. In Dyson, the court emphasized that design safety must take into account differentiation between various models and such, in my opinion, is obvious. Indeed this varying degree of safety is even recognized in the Traffic and Motor Vehicle Safety Act which undertakes "to establish motor vehicle safety standards for motor vehicles". 15 U.S.C. § 1381 et seq. In prescribing such standards, the Act directs the secretary to "consider whether any such proposed standard is reasonable, practicable and appropriate for the particular type of motor vehicle or item *1053 of motor vehicle equipment... ." § 1392(f)(3).
This discourse must not be interpreted as an inappropriate dissent to Evancho, supra, in which my superiors, adopting the Larsen Rule, opined that the manufacturer has a reasonable duty to provide "safe transportation." In Evancho, not only was any duty to warn not an issue, but the crash of a much larger, much more expensive, automobile was involved, and there is little doubt but that our Supreme Court would distinguish a case in which the injuries occurred as the result of a similar crash in a Volkswagen beetle or worse yet, a motorcycle, which latter has no crashworthiness whatever, and is comparable to riding around on a broomstick. Moreover, in Evancho, the Court's conclusion that safe transportation must be furnished was qualified by the phrase "or as safe as is reasonably possible under the present state of the art."
No one can argue but that manufacturers should make small economy vehicles crashworthy, but doing so may not help the poor man if the price is increased as a result, and he, instead, is forced to resort to transportation much less protective than the present Pinto in order to go about the obviously dangerous business of driving on the highway.
As Professor Henderson noted in his exhaustive article in the Columbia Law Review, 73 Colum.L.Rev. 1531 (1973), the "courts are inherently unsuited to the task of establishing safety standards in cases involving the liability of manufacturers." In his view, minimum design safety standards for various automobiles should be established from scientific tests and compilation of data conducted by informed arms of the legislature. At page 1559, he asks the crucial question: "How much design safety is enough?"
I cannot answer this question from the bench.
NOTES
[1] Second collisions, secondary collisions or secondary impacts are three interchangeable phrases used to define the situation where the alleged defect in the auto was not, in any way, the cause of the injury to the occupant of the automobile involved in the accident.