419 So.2d 687 (1982)
DETROIT MARINE ENGINEERING, INC., and Sheller-Globe Corporation, Appellants,
v.
Carolyn MALOY, As Personal Representative of the Estate of Aubrey Maloy, Deceased, Appellee.
No. AC-100.
District Court of Appeal of Florida, First District.
September 1, 1982.
Rehearing Denied October 5, 1982.
*688 Robert P. Gaines of Beggs & Lane, Pensacola, for Detroit Marine Engineering, Inc., appellant.
Charles J. Kahn, Jr., and Louis K. Rosenbloum of Levin, Warfield, Middlebrooks, Mabie & Magie, Pensacola, for Sheller-Globe Corp., appellant.
Stephen S. Poche, Shalimar and Henry T. Courtney, Miami, for appellee; George W. Chesrow, Miami, of counsel.
McCORD, Judge.
Detroit Marine Engineering, Inc. (Detroit Marine) and Sheller-Globe Corporation *689 (Sheller-Globe) appeal from a final judgment, rendered after a jury trial, in favor of Carolyn Maloy as the personal representative of the Estate of Aubrey Maloy in a wrongful death action. The personal representative was awarded compensatory damages against both defendants of $50,000 for the estate, $500,000 for herself, and $600,000 for her daughter. Also assessed were punitive damages for the estate of $50,000 against each of the two appellants.
While appellants raise a multiplicity of issues, this appeal essentially stands or falls on their contention that the trial court erred in failing to grant their motions for directed verdict on the issue of liability. Accordingly, the following are the facts in the light most favorable to the Estate, considered for the purpose of determining whether Detroit Marine and Sheller-Globe were entitled to a directed verdict upon liability.
On April 30, 1977, the deceased took a boat borrowed from his wife's uncle to Lake Silver to test it before taking the boat to Louisiana for a planned vacation and fishing trip with his family. According to his usual practice, Aubrey Maloy told his wife and children to wait on the shore of Lake Silver while he took out the boat and tried it first. He told his wife and children that if everything was alright with the boat, he would come back in a few minutes, pick them up, and take them for a ride.
Within three to five minutes after Maloy had left shore in the boat, an onlooker standing at the launching ramp, James Watford, first became aware that there was a problem with the boat. Watford saw Aubrey in the water with the boat circling about him. According to another onlooker on the dock, Dr. Robert Fountain, Aubrey was trying to dodge the boat, which was coming close to him, "turning in fairly tight circles" in the middle of the lake. Upon realizing Aubrey's predicament, Fountain and Watford went out into the lake in Fountain's boat. When they reached the area where they thought Maloy had gone down the last time, Fountain put on a mask and fins and dove into the water; however, he was unsuccessful in his search due to the murkiness of the water. Marking the location with buoys, they returned to shore and called the sheriff's department and an ambulance. After a deputy arrived, Fountain got his scuba equipment, went back into the lake, and shortly afterwards located Maloy's body. He also recovered part of the steering wheel, the rim, very near the body. Once the boat had run itself ashore, it was discovered that the hub was still intact on the steering column of the boat and that the driver's seat had been overturned. Otherwise there was no indication as to what had caused Maloy to be thrown from the boat. Nobody on the shore had been watching him at the time of this unfortunate incident.
Upon this basic overlay of facts, the plaintiff sought to prove that the steering wheel was defective and that its fracturing was the cause of Maloy's death. The history of this particular steering wheel is thus of crucial importance in resolving the issues presented by this appeal.
Sheller-Globe's primary business is manufacturing steering wheels. Until 1968, all of the plastic steering wheels manufactured by it had a metal insert inside of them. The metal insert consisted of a steel hub to which steel spokes and a rim are welded together. The metal insert is then placed in a mold and plastic is injected around the steel insert. However, sometime prior to 1968, the president of Detroit Marine approached Sheller-Globe about manufacturing a cheaper wheel because Detroit Marine desired a wheel that could be purchased for less than $2.00. This led to the development of an insertless wheel, the only apparent advantage of which is that it could be made more cheaply.
Sheller-Globe began production of these insertless marine steering wheels in 1968. Detroit Marine's president gave Sheller-Globe's designer the details as to the styling of the insertless wheel. The mold for the wheel was designed by a Canadian company and was owned by Detroit Marine. Detroit Marine also supplied the diecast hubs to Sheller-Globe for use in the manufacture of *690 the wheel. This manufacture occurred despite the opposition of Paul Weitzman, who was responsible for the production of plastic steering wheels for Sheller-Globe. Weitzman questioned the reliability of an allplastic steering wheel and felt that such a wheel would have only a limited use on small boats in inland lakes but not on a racing craft or on an application where unusual torque requirements would exist and that the wheel would be subject to deterioration in the sun.
Donald Bowser, who was the manager of engineering at Sheller-Globe's plant where the insertless wheels were manufactured, was also critical of the insertless plastic wheels. He, too, felt that the wheel was not strong enough. Another former mechanical engineer for Sheller-Globe, Herbert McKen, also testified that from 1968 to 1978, the insertless wheels were not "a reliable product" and "shouldn't be put on the market." By 1978, however, improved engineering processes and better knowledge of plastics had resulted in a significantly improved insertless wheel. In 1972, when the subject wheel had been manufactured, adequate process control equipment had not yet been invented and it was "very difficult to determine whether (the company) had a good product or not."
Plaintiff also presented the crucial testimony of Lawrence J. Broutman. Dr. Broutman had a PhD in plastics engineering at MIT and is a professor of engineering at the Illinois Institute of Technology, among other impressive credentials. Broutman testified that the wheel was defective in several respects. First, it was defectively designed. For one, the areas where the spokes of the steering wheel attached to the hub were too thin. Further, the most severe design defect was that there was absolutely no attempt in this wheel to round off corners. Broutman explained that in designing a plastic product, two walls or sections of the plastic should never meet so as to form a sharp corner. He directly attributed the wheel's fracture to this very defect.
Broutman also felt that there were several manufacturing defects which caused the steering wheel to be brittle and weak. He noted that the plastic used, known as ABS, was a combination of polystyrene and rubber. The rubber was utilized to add ductility to the plastic. However, upon exposure to ultraviolet rays, such as sunlight, the ABS would become brittle and subject to deterioration. Broutman also felt that the ABS had deteriorated because of excessive heating of the plastic prior to injection into the mold and because of the addition of regrind material. The addition of regrind was a problem because it had already been subjected to elevated temperatures and had thus somewhat deteriorated. The overall effect was to lower the quality of the ABS. Moreover, Broutman testified that x-rays showed the steering wheel to have substantial numbers of airpockets, or voids, which were caused by the mold temperature being too cold to get a proper injection of plastic into the mold. Thus, more pressure was needed to inject the plastic, which pressure caused overpacking in the hub area and weakness in the steering wheel.
Upon these basic facts Detroit Marine and Sheller-Globe contend that in reaching the verdict, the jury impermissibly had to pyramid inference upon inference in order to infer from circumstantial evidence, not only that a defect in the steering wheel caused the wheel to break, but also that the breaking of the wheel caused the injury to Mr. Maloy. See, e.g., Voelker v. Combined Ins. Co. of America, 73 So.2d 403 (Fla. 1954); Nielsen v. City of Sarasota, 117 So.2d 731 (Fla. 1960). They contend that the evidence shows reasonable inferences that could have resulted in undue stress being placed upon the wheel, causing it to break.
The Estate correctly notes that it did not rely primarily on circumstantial evidence to prove that the steering wheel on the boat was defective at the time it left the manufacturer and at the time of the accident. Dr. Broutman testified that the sharp corners where the spoke met the hub of the steering wheel (the place of the fracture) were elementary design defects and should *691 never have been incorporated into the design of the wheel. He directly attributed the fracture to that deficiency. Further, as previously noted, the steering wheel was negligently manufactured, and thus brittle, because of excessive heating of the plastic before it was injected into the mold, the additive of regrind as a cost-saving device, and internal stresses created in the hub of the wheel caused by the mold temperature which was too cold to allow for proper injection of the plastic into the mold. Broutman's testimony was buttressed by three former engineers at Sheller-Globe who were involved in the production of the wheel and who concurred in Broutman's opinion that the wheel was unreliable.
The jury's resolution of the issue of legal causation between the defective steering wheel and Maloy's injury is supported by the evidence. Dr. Fountain testified that after the fatal accident the broken rim of the steering wheel was found in the water next to Aubrey Maloy's body. The logical and permissible inference to be drawn from this fact is that Maloy was holding onto the defective wheel when it broke and that this fracturing of the wheel was the cause of his death. Although there may be other conflicting inferences which could be drawn from these facts, the jury's resolution of the evidentiary issues in the Estate's favor is not subject to reversal:
(I)f the circumstances established by the evidence be susceptible of a reasonable inference or inferences which would authorize recovery and are also capable of an equally reasonable inference, or inferences, contra, a jury question is presented.
Voelker, at 406.
Detroit Marine separately argues that it is entitled to a directed verdict on the issue of liability because it relied entirely upon the skill and expertise of Sheller-Globe and did not participate in the manufacture of the steering wheel. Alternatively, it argues that the verdict is against the manifest weight of the evidence and that it is entitled to a new trial.
Addressing the former argument first, we find that the evidence amply supports the jury's finding of negligence by Detroit Marine. The company owned the mold that was used by Sheller-Globe to manufacture the wheel, supplied Sheller-Globe with the diecast hubs incorporated into all of these plastic steering wheels, directly communicated with the engineers at Sheller-Globe concerning the development and eventual production of the wheel, and sold the wheels which were manufactured exclusively for Detroit Marine as its own product. Detroit Marine's secondary argument that the verdict is against the manifest weight of the evidence is without merit.
Appellants also urge that the trial court erred in failing to admit the results of tests by Sheller-Globe on 14 Black Dolphin steering wheels of varying dates that had been used on boats in Florida and some mock-up wheels made by Sheller-Globe in connection with this litigation. "Dolphin" is the name ascribed to the subject steering wheel, of which there were two basic models, a black one and a white one. The black model is virtually identical to the white model in all respects, save its color, which is due to the addition of carbon black. Certain witnesses for the appellants asserted that the addition of carbon black was sufficient to protect the ABS plastic from ultraviolet deterioration. Testifying for the Estate, Dr. Broutman expressed a contrary view.
When appellants attempted to introduce into evidence the results of tests upon the black Dolphin wheels gathered from boats in Florida, counsel for the estate argued that the defense had not established the requisite similarity between these steering wheels and the subject steering wheel. The evidence reveals that subsequent to the manufacture of the wheel involved in this case, Sheller-Globe in September of 1972 changed plastics from Uniroyal K-3144 ABS to K-2996 ABS plastic. K-2996 has a higher and broader temperature range and therefore could be used more easily in the molding process. Further, the mold was changed to improve the design of the steering wheel by rounding off the sharp corners. Considering these factors, the trial *692 court ruled that it would allow testimony on any wheels that were manufactured prior to the production of the wheel in this case and any wheels that were manufactured up to the time of the change-over in materials.
Upon these facts, appellants urge that the trial court should have allowed the test into evidence because of "substantial similarity" between the 14 Dolphin wheels and the subject wheel. See, e.g., Mutual Life Ins. Co. of New York v. Bell, 147 Fla. 734, 3 So.2d 487 (1941). The determination of the similarity of circumstances must be left to the sound discretion of the trial court and absent an abuse of discretion its ruling will be upheld. Morton v. Hardwick Stove Co., 138 So.2d 807 (Fla. 2d DCA 1962), cert. denied 149 So.2d 48 (Fla. 1962). We find no abuse of discretion. Appellants' expert witness, Dr. Riley, testified that he did not know when the steering wheels from Florida were manufactured. Moreover, he did not know whether these steering wheels were made out of the same material as the subject wheel. Except for one of these wheels, appellants were never able to establish that any were manufactured prior to or at the same time as the wheel involved in this case or before the change-over in materials. Although they were able to establish that one of these steering wheels was manufactured prior to the wheel involved in this case, Sheller-Globe's witness did not know when the wheel arrived in Florida, how long it had been on the boat from which it came, how the boat was used, whether the boat had been subjected to sunlight, or any of the conditions surrounding the use of the wheel. Considering these facts in a light most favorable to the trial court's ruling, as we must, we are unable to find an abuse of discretion in its determination that a requisite substantial similarity was not shown.
We conclude that the trial court correctly excluded the test on the mock-up wheels prepared by Sheller-Globe for this litigation. These mock-ups were made from a different plastic. Further, Sheller-Globe failed to establish that the molding process used to manufacture the mock-up wheels was similar to the process which was in use in 1972, the date of manufacture of the steering wheel in dispute. Appellants' expert witness admitted that in 1972 the insertless wheels were not very reliable because the manufacturer was not able to assure "very good repeatability in molding." This witness had earlier testified that in 1972 the manufacture of insertless plastic wheels was a new art but that by 1978 better materials, engineering, equipment, and more knowledge was available. Since the evidence affirmatively establishes that these mock-up wheels were manufactured under different circumstances and conditions and made with different materials than the wheel involved in this accident, the requisite substantial similarity was not established. To have admitted them into evidence would have raised collateral issues that would only confuse the jury. See Auto Specialties Manufacturing Co. v. Boutwell, 335 So.2d 291 (Fla. 1st DCA 1976), cert. denied 341 So.2d 1080 (Fla. 1976).
Appellants also urge that the trial court erred in admitting into evidence four specific exhibits. The first is a letter dated September 29, 1969, from the president of Detroit Marine to Sheller-Globe referring to over 100 of the insertless wheels made of butyrate that were in several customers' plants which were sent back by dealers in a "distorted condition." Specifically, appellants urge that this document should not have been admitted because the subject wheel was made from ABS plastic and not butyrate. Error, if any, in the admission of this document is harmless, for the same information was already before the jury without objection in the form of testimony by Paul Weitzman, a former engineer at Sheller-Globe. See Farmer v. B.F. Goodrich Co., 252 So.2d 593, (Fla. 2d DCA 1971), cert. denied 255 So.2d 686 (Fla. 1971). Similarly, we find no reversible error in the admission of a Sheller-Globe memorandum dated April 30, 1981, which stated that during tests performed on the white insertless wheel, two wheels failed deflection tests and passed torque and axle tests. The contents of the memorandum and the results of *693 the test were already before the jury without objection prior to appellant's objection to the entry of the document itself. Thus, any error is harmless and the document itself is merely cumulative. Id.
Appellants also objected to the admission of two other documents, a Sheller-Globe memorandum dated July 19, 1972, to Donald Bowser requesting a report on the breakage of a white insertless Dolphin wheel and a letter of June 27, 1972, from Sheller-Globe to Detroit Marine's president acknowledging receipt of the hub and spoke section of a white insertless Dolphin wheel returned to Detroit Marine by Chrysler.
The trial court initially sustained the appellant's objection to the memorandum of July 19, 1972, on the ground that plaintiff had presented no evidence to show that the white insertless wheel and the black insertless wheel were the same. Subsequent testimony, however, confirmed that the configuration and mold for the white and black wheels were exactly the same. Further, Dr. Broutman testified that carbon black is added to ABS plastic to make the black wheel and titanium dioxide is added to ABS plastic to make the white wheel. Both coloring agents are added in small concentrations, ranging from 1-half to 1%. Broutman explained that in small concentrations such as this, the additions of pigments to ABS did not affect the properties of the plastic. Given the evidence of the identical design of the white and black insertless wheels, and Dr. Broutman's testimony regarding the effect of the additives on the ABS plastic, we find that the plaintiff established the requisite similarity between the two so as to render the document relevant.
Appellants subsequently established that the black and white wheels were made of two different types of ABS plastic. However, such a ground for rejecting the document was not specifically offered at the time of its admission into evidence. Therefore, the argument that the document should not have been admitted due to the dissimilarity of the plastics has not been properly preserved for appellate review. See Castor v. State, 365 So.2d 701 (Fla. 1978). In any event, the jury was properly apprised of such fact and could attach the appropriate weight to the previously admitted memorandum. The letter of June 27, 1972, stands in the same stead.
Finally, appellants argue that the trial court erred in failing to grant a directed verdict on the issue of punitive damages. It is true, as appellants acknowledge, that punitive damages may be awarded in a products liability case. American Motors Corp. v. Ellis, 403 So.2d 459 (Fla. 5th DCA 1981). Nevertheless, while the evidence in this case, does support the jury's finding of negligence on the part of Detroit Marine and Sheller-Globe, this evidence does not amount to a showing that appellants' actions or inactions amount to willfulness, wantonness, maliciousness, recklessness, oppression, or outrageous conduct. Id. Accordingly, the award of punitive damages is stricken.
We have considered the remaining point on appeal and find it to be without merit.
Affirmed in part, reversed in part, and remanded to the trial court for further proceedings consistent with this opinion.
ERVIN and SHAW, JJ., concur.