438 So.2d 192 (1983)
TOYOTA MOTOR COMPANY, LIMITED, a Foreign Corporation, Appellant/Cross Appellee,
v.
Betty J. MOLL, As Personal Representative of the Estates of Wendy Jane Moll, Deceased, Pamela May Moll, Deceased and Denise Ann Moll, Deceased, Appellee/Cross Appellant.
TOYOTA MOTOR SALES, USA, INC., a Foreign Corporation, Appellant/Cross Appellee,
v.
Betty J. MOLL, As Personal Representative of the Estates of Wendy Jane Moll, Deceased, Pamela May Moll, Deceased and Denise Ann Moll, Deceased, Appellee/Cross Appellant.
TOYOTA MOTOR SALES COMPANY LIMITED, a Foreign Corporation, Appellant/Cross Appellee,
v.
Betty J. MOLL, As Personal Representative of the Estates of Wendy Jane Moll, Deceased, Pamela May Moll, Deceased and Denise Ann Moll, Deceased, Appellee/Cross Appellant.
TOYOTA MOTOR COMPANY, LIMITED, Toyota Motor Sales, Usa, Incorporated and Toyota Motor Sales Company, Limited, Appellants,
v.
Betty J. MOLL, As Personal Representative of the Estates of Wendy Jane Moll, Deceased, Pamela May Moll, Deceased and Denise Ann Moll, Deceased, Appellee.
Nos. 81-2103 to 81-2105, 82-532.
District Court of Appeal of Florida, Fourth District.
October 5, 1983.
*193 T. Rumberger, James A. Edwards of Rumberger, Kirk, Caldwell & Cabaniss, Orlando, Jay M. Smyser, Chicago, Ill., for appellants/cross appellees.
Joel D. Eaton of Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin, Miami, Jack Marcus, Simons & Schlesinger, P.A., Fort Lauderdale, for appellee/cross appellant.
HURLEY, Judge.
This appeal arises from a products liability case based on the allegation that the fuel tank system in the 1973 Toyota Corona was defectively designed. The jury found for the plaintiff. Toyota appeals, contending that the trial court erred on a critical evidentiary matter and, also, by allowing the issue of punitive damages to go to the jury. We disagree with both contentions and affirm.
The facts of the collision are not in substantial dispute. On the afternoon of June 16, 1979, the driver of a 1977 Mercury Cougar lost control of her car on a rain-slick portion of Interstate-95. The Mercury spun 180 degrees and came to rest sideways across I-95. At that instant, three young sisters, Wendy, Pamela and Denise Moll, were also proceeding north on I-95 in their 1973 Toyota Corona.[1] They saw the Mercury and managed to stop either a short distance away or after lightly touching the Mercury's bumper. No one was seriously injured. Moments later, however, the Toyota was struck in the left rear by a 1969 Oldsmobile traveling between twenty-eight and forty miles per hour. The impact caused the Toyota's fuel system to rupture; the vehicle became an inferno. Tragically, the doors jammed and the three Moll sisters were burned to death.
Mrs. Betty Moll, the girls' mother and personal representative, instituted suit against Toyota in its corporate forms as manufacturer, exporter from Japan and importer into the United States. The complaint alleged that the girls' deaths were caused by the defective design of the fuel system and, therefore, each corporate defendant was liable under theories of negligence, breach of warranty and strict liability. The jury found for the plaintiff and returned a verdict against the manufacturer in the sum of $2,004,886 compensatory damages and $3,000,000 punitive damages.
Toyota has raised several points on appeal but, in our view, only two merit extended discussion. The first involves Toyota's claim that the trial court abused its discretion and committed reversible error by excluding two films from evidence. Both films depicted crash-tests on selected 1973 automobiles. The trial court permitted the plaintiff to show a portion of one film which demonstrated the effect of a rear-end collision on a stationary 1973 Toyota Corona. The court, however, denied the defendant's request to show the remainder of the film which depicted similar tests on other makes and models. On appeal, Toyota argues that the trial court's rulings effectively prevented it from proving its state of the art defense, i.e., that the '73 Corona was as safe as the technology of the time permitted and that it conformed to accepted standards within the industry.
At the outset, we note that the record fails to support Toyota's contention. In fact, the record is replete with evidence of industry custom and it is simply inaccurate to suggest that the two contested rulings precluded the establishment of a state *194 of the art defense. Moreover, we are satisfied that the trial court did not abuse its discretion by excluding the two films. As a preliminary matter, Toyota failed to demonstrate that the various vehicles depicted in the films contained design features which were representative of, or customary in the industry.[2]Cf. Ford Motor Co. v. Havlick, 351 So.2d 1050 (Fla. 4th DCA 1977) (Letts, J., dissenting). More important, however, is the rule that a trial court possesses broad discretion over the admissibility of evidence which will inject collateral issues into the trial. Badorek v. General Motors Corp., 11 Cal. App.3d 902, 90 Cal. Rptr. 305 (3d DCA 1970) is "on all fours" with the case at bar. There, General Motors, in an effort to support its state of the art defense, attempted to introduce evidence of the design of fuel containment systems in numerous vehicles other than the one in suit. As happened here, the California trial court permitted proof of industry design practices, but refused to permit the defendant to go into the designs of specific automobiles. The trial court voiced concern that if the evidence were permitted, the trial would go on forever. The district court of appeal affirmed, holding that the evidence's time consuming factor had to be weighed against its probative value. The same is true here. The proffered evidence had the potential of diverting the case onto time-consuming tangents. Thus, we hold that the trial court did not abuse its discretion in refusing to admit the remainder of the films. Cf. Atlantic Coast Line R. Co. v. Campbell, 104 Fla. 274, 139 So. 886 (1932).
Next, Toyota contends that the trial court erred by not granting a directed verdict on the issue of punitive damages. Again, we disagree. Punitive damages may be imposed when the defendant's "actions or inactions amount to willfulness, wantonness, maliciousness, recklessness, oppression, or outrageous conduct." Detroit Marine Engineering, Inc. v. Maloy, 419 So.2d 687, 693 (Fla. 1st DCA 1982). See also Piper Aircraft Corp. v. Coulter, 426 So.2d 1108 (Fla. 4th DCA 1983); see generally Courtney & Cavico, Punitive Damages: When Are They Justifiable?, Trial, August, 1982 at 52. More specifically, "punitive damages ... [are] allowed where the defendant had knowledge of a defect or dangerous condition and chose not to remedy the condition." American Motors Corp. v. Ellis, 403 So.2d 459, 468 (Fla. 5th DCA 1981). Accord, Wangen v. Ford Motor Co., 97 Wis.2d 260, 294 N.W.2d 437 (1980); Sturm, Ruger & Co. v. Day, 594 P.2d 38 (Alaska 1979).
American Motors Corp. v. Ellis, supra, restated the well known principles which govern directed verdicts:
A motion for directed verdict should not be granted when there is any reasonable evidence upon which a jury could legally predicate a verdict in favor of the nonmoving party... . In considering a motion for directed verdict for the defendant, the court is required to evaluate the testimony in the light most favorable to the plaintiff and every reasonable inference deduced from the evidence must be indulged in plaintiff's favor.
Id. at 467 (citations omitted).
Here the evidence showed that the fuel tank in the 1973 Corona is a "flange-mounted" tank which is located behind the rear axle under the vehicle's trunk area. The trunk is designed with a hole in the floor into which a steel fuel tank is inserted. Flanges on the sides of the tank fit over the edges of the hole, and the flanges are screwed into place with sheet metal screws, so that the top of the tank forms the floor of the trunk. A rigid steel pipe, approximately 14 inches in length, is utilized to fill the tank. One end of the pipe extends into the fuel tank while the other end protrudes through a hole in the vehicle's rear panel. Significantly, the rear panel hole is sixty millimeters in diameter. The twist-off cap *195 which is utilized to close the filler pipe is sixty-four millimeters in diameter. In other words, the cap is larger than the hole through which the filler pipe extends.
The plaintiff's expert posited three major design defects in the 1973 Corona fuel tank system: (1) the location of the fuel tank, (2) the rigidity of the filler pipe, and (3) the "bottle opener" effect which occurrs when the gas cap is pried off as a result of the filler pipe being forcibly pulled back through the hole in the vehicle's rear panel. On the issue of punitive damages, the inquiry focused on Toyota's knowledge of these defects and its failure to take prompt remedial action. Testimony revealed that Toyota learned as early as 1966 or 1967, that the rigid filler pipe would rotate forward, i.e., it would face into the trunk space, if the car was hit in the rear by another vehicle going twenty miles per hour. This was significant because there is virtually no protection between the trunk space and the passenger compartment in the '73 Toyota Corona. The 1966 or '67 crash tests also indicated that the gas cap would be pried off as the filler neck rotated forward.[3]
In the early seventies, Toyota conducted research which, according to one of its executives, convinced the company "that the safest location for the fuel tank is just behind the rear seat back instead of beneath the floor of the luggage compartment."[4] Consistent with this conclusion, Toyota changed the configuration of its Mark II model vehicle from an aft-filled behind-the-axle tank to a side-filled over-the-axle tank for the model year 1972. For the '73 model year, Toyota also changed the configuration of its Corina and Celica models from aft-filled behind-the-axle tanks to side-filled over-the-axle tanks. However, for reasons that were never satisfactorily explained at trial, Toyota chose not to change the design of the fuel containment system in the 1973 model Corona. Indeed, the '73 Corona was the only vehicle in the entire line of 1973 model vehicles manufactured by Toyota which continued to utilize an aft-filled behind-the-axle tank.
Bearing in mind that "[a] directed verdict should not be granted where there is any reasonable evidence tending to prove the plaintiff's case," Howarth v. Moreau, 430 So.2d 576, 577 (Fla. 5th DCA 1983), we hold that the record in the case at bar fully justifies the trial court's decision to submit the issue of punitive damages to the jury. Moreover, there is ample evidence from which the jury could have reasonably concluded that Toyota knew of the defects and, in wanton disregard of the safety of the purchasing public, continued to market the '73 Corona without correcting its lifethreatening design flaws. Accordingly, the judgment on appeal is
AFFIRMED.
DELL, J., and OWEN, WILLIAM C., Jr., Associate Judge, concur.
NOTES
[1] The Molls' 1973 Toyota Corona was designed in 1965 and assembled in 1972.
[2] One film entitled "Cars That Crash and Burn," portrayed six stationary vehicles  a Toyota, a Chevrolet Vega, a Plymouth Fury, a German-built Buick Opel 1900 Series, an American Motors Ambassador and a Ford Pinto  being rear-ended by another 1973 automobile traveling at about 39 miles per hour. The fuel containment system in each vehicle ruptured upon impact.
[3] A 1969 crash test confirmed that the filler neck would rotate forward on impact, but in this test the gas cap remained on.
[4] Letter dated March 1, 1974, from Keitaro Nakajima, Director/General Manager, Toyota Motor Sales, U.S.A., Inc., to Hon. John E. Moss, M.C., Chairman, U.S. House of Representatives' Interstate and Foreign Commerce Subcommittee on Commerce and Finance.