474 So.2d 834 (1985)
Jack E. WOLMER, Etc., Appellant,
v.
CHRYSLER CORPORATION, et al., Appellees.
No. 82-2333.
District Court of Appeal of Florida, Fourth District.
July 17, 1985.
Rehearing, Rehearing and Certification Denied September 19, 1985.
*835 Joel S. Perwin of Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin, P.A., Miami, and Gilbert A. Haddad of Haddad, Josephs & Jack, P.A., Coral Gables, for appellant.
Michael B. Davis of Davis, Critton, Hoy & Diamond, West Palm Beach, and Sheila L. Birnbaum of Skadden, Arps, Slate, Meagher & Flom, New York City, for appellee-Chrysler Corp.
Rehearing, Rehearing En Banc and Certification Denied September 19, 1985.
HURLEY, Judge.
Plaintiff brought a wrongful death action based on negligence and strict liability. The jury found negligence and awarded compensatory and punitive damages. The trial court, however, in a post-trial decision, granted the defendant's motion for a directed verdict and vacated the punitive damage award. We reverse.
In October, 1976, Jack Wolmer purchased a new 1977 Plymouth Volare station wagon, manufactured by Chrysler Corporation. Almost a year later, on September 27, 1977, his wife Mary was burned to death when their station wagon was hit from behind on Interstate-95. The collision occurred at about 10:30 p.m. as Mrs. Wolmer and two friends were returning to Fort Lauderdale from Miami. The friends were seated in the front; Mrs. Wolmer was riding in the back seat.
The Wolmer vehicle was traveling north in the center lane of I-95, approaching the overpass above the New River. Ahead, near the top of the incline and in the same lane, a car had stopped. Some cars managed to go around, but traffic was heavy and an Oldsmobile was forced to stop directly behind the disabled vehicle. The Wolmer's station wagon stopped behind the Oldsmobile. Almost at once, a Chevrolet pick-up truck, traveling at approximately 50 miles per hour, slammed into the rear of the Wolmer's station wagon.
Witnesses said that the station wagon became an instantaneous ball of fire. One witness said that the flames were at least six feet high. Another witness told how he "saw a large ball of flame shoot up in the air, similar to when [he] worked the flamethrower in the Army. It shot up quite high, higher than the streetlights." The front-seat passengers managed to escape through the driver's window, but Mary Wolmer, engulfed in flames, died instantly.
The complaint, which set forth a cause of action for wrongful death, alleged negligence and strict liability. At the close of the evidence, Chrysler renewed its earlier motion for a directed verdict. The trial court reserved ruling and submitted the case to the jury which returned a detailed verdict. It found for the plaintiff on the negligence count and against the plaintiff on the strict liability count. It assessed compensatory damages at $500,000 for the plaintiff and $500,000 for the estate. It further found that Chrysler acted "with wantonness, wilfullness, or reckless indifference to the rights of others" and, therefore, assessed punitive damages at $3,000,000. Thereafter, the trial court entered an order requiring a remittitur of $300,000 from the $500,000 compensatory verdict for the estate or, in the alternative, a new trial on that issue. The plaintiff agreed to the remittitur. The trial court later entered a second order granting Chrysler's renewed motion for a directed verdict on the issue of punitive damages. This resulted in the present appeal.

I
The issue here is whether the trial court was justified in granting a directed verdict on punitive damages. Thus, we review the governing principles. "In considering the propriety of a directed verdict for a defendant the trial court is required to evaluate the testimony in the light most favorable to the plaintiff and every reasonable intendment deducible from the evidence must be indulged in the plaintiff's favor." McDaniel v. Great Atlantic & Pacific Tea Co., 327 So.2d 893, 895 (Fla. 3d DCA 1976); see *836 also Hartnett v. Fowler, 94 So.2d 724 (Fla. 1957); Toyota Motor Co. v. Moll, 438 So.2d 192 (Fla. 4th DCA 1983); Tesher & Tesher, P.A. v. Rothfield, 387 So.2d 499 (Fla. 4th DCA 1980). "Directed verdicts should be granted cautiously in order not to encroach upon a party's right to a jury trial." Packer v. Winston Towers One Hundred Association, 377 So.2d 46 (Fla. 3d DCA 1979).
The Florida Supreme Court recently restated the standard for imposing punitive damages in White Construction Co. v. Dupont, 455 So.2d 1026 (Fla. 1984). Quoting from its earlier decision in Carraway v. Revell, 116 So.2d 16 (Fla. 1959), the court held:
The character of negligence necessary to sustain an award of punitive damages must be of a "gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them".
455 So.2d at 1029. The court recapitulated the above standard in Como Oil Co. v. O'Loughlin, 466 So.2d 1061, 1062 (Fla. 1985), saying that "the degree of negligence necessary for punitive damages is willful and wanton misconduct equivalent to criminal manslaughter. The required misconduct goes beyond gross negligence."
The foregoing standard is fully applicable to products liability cases where it has been restated in this fashion:
A legal basis for punitive damages is established in products liability cases where the manufacturer is shown to have knowledge that its product is inherently dangerous to persons or property and that its continued use is likely to cause injury or death, but nevertheless continues to market the product without making feasible modifications to eliminate the danger or making adequate disclosure and warning of such danger.
Johns-Manville Sales Corp. v. Janssens, 463 So.2d 242, 249 (Fla. 1st DCA 1984), review denied, 467 So.2d 999 (Fla. 1985); see also Piper Aircraft Corp. v. Coulter, 426 So.2d 1108 (Fla. 4th DCA), review denied, 436 So.2d 100 (Fla. 1983); Toyota Motor Co. v. Moll, supra; American Motors Corp. v. Ellis, 403 So.2d 459 (Fla. 5th DCA 1981), review denied, 415 So.2d 1359 (Fla. 1982); Dorsey v. Honda Motor Co., 655 F.2d 650 (5th Cir.1981).

II
Plaintiff in the case at bar contended that the '77 Volare station wagon had several design characteristics which, either individually or in combination, caused the death of Mary Wolmer. In this review, we focus on two of the alleged defects. The first involved contact between the fuel tank and the left rear shock absorber. In a rear-end collision, the fuel tank, which is secured by straps under the floor pan behind the rear axle, will push forward and upward. If struck with sufficient force, the fuel tank will ride over the differential and contact the shock absorber. This occurred in the Wolmer crash. The fuel tank, loaded with a substantial quantity of gasoline, was propelled forward and punctured by the top of the shock absorber which had come loose.
The second design characteristic involved the fuel filler tube which extended from the gas cap on the left rear quarter panel into the fuel tank. At the gas-cap end, there was a fixed  rather than a breakaway  connection; it was actually screwed to the rear quarter panel. The other end of the filler tube was simply inserted into the fuel tank where it was held in place by a donut-like rubber grommet which yielded easily to force. The plaintiff introduced evidence to show that, in a rear-end collision, the station wagon's two rear side panels will deflect outward, away from the car. Since the filler tube is affixed to the rear quarter panel, it too will pull outward and, if there is sufficient movement, it will *837 be yanked out of the fuel tank. This also occurred in the Wolmer crash.
Both of these design characteristics had a causal relationship to the flash fire that consumed Mary Wolmer. When the fuel tank was forced forward, the gasoline inside reacted by coming back under intense pressure. Studies estimate that the pressure was ten times greater than the water pressure in an ordinary garden hose. The holes caused by the shock absorber and the removal of the filler tube permitted gas to spurt out in a flamethrower effect, showering the back seat area with highly combustible vapor drops.
To establish a prima facie products liability case, the plaintiff called two expert witnesses who testified that both of the foregoing design characteristics constituted substantial defects which imperiled life and limb. One of these witnesses said that the filler tube's fixed connection was "a gross design defect" which violated a very basic safety engineering principle and posed a "[t]otally unreasonable" risk of danger to any passenger seated in the rear of the station wagon.
As a predicate for punitive damages, the plaintiff introduced testimonial and documentary evidence to show that Chrysler marketed the '77 Volare station wagon knowing that it contained defects likely to cause death or serious injury. Part of this proof came from Chrysler's own records. In an effort to demonstrate compliance with a government-imposed standard, Chrysler conducted a series of crash tests simulating rear-end collisions. These tests consisted of striking the back end of a Chrysler vehicle with a 4000-pound moving barrier traveling at thirty miles per hour. Test reports revealed contact problems between the fuel tank and shock absorber. Also, there were problems of fuel leakage from the filler tube. The reports evidenced Chrysler's actual knowledge of both problems. One of the plaintiff's expert witnesses testified that in light of the difficulties encountered by Chrysler during the crash tests, it was obligated to conduct additional crash tests at higher speeds. The same witness said that Chrysler's failure to do more testing constituted "an atrocious violation of accepted practices in safety engineering" which demonstrated "a reckless disregard for safety." A second expert witness testified that Chrysler's crash tests made it "clearly foreseeable" that the fuel tank would impact with the shock absorber if the station wagon were involved in a rear-end collision at normal highway speeds. This witness said that as speeds increased beyond the 30-mile-an-hour test range, the likelihood of a breach in the fuel system was "very great." While the tests demonstrated compliance with the government's minimum standard, predictive analysis would indicate "fuel system compromise" at higher speeds. Indeed, a Chrysler inter-office memorandum, dated September 9, 1976,  a month prior to the sale of the Wolmers' station wagon  stated that several Chrysler models, including the '77 Volare station wagon, "marginally meet the [government-mandated] fuel system requirements... ."
The foregoing evidence, when viewed in the light most favorable to the plaintiff, would permit a jury to reasonably infer that Chrysler had actual knowledge that the fuel system in the 1977 Volare station wagon was inherently dangerous to life and limb and, still, continued to market the vehicle. Thus, there was sufficient evidence to let the issue of punitive damages go to the jury.

III
On appeal, Chrysler advances a novel theory to counter the plaintiff's evidence on punitive damages. It contends that the jury's negative finding on strict liability "necessarily disposes of Plaintiff's ... argument that Chrysler had actual knowledge of a defect... ." In other words, Chrysler suggests that when, as in this case, the trial court reserves ruling on a motion for a directed verdict, it may consider the jury's findings when ruling on the motion. Put another way, Chrysler asserts that the trial court, in reaching its decision, should exclude evidence rejected *838 by the jury. Thus, Chrysler states that "[i]f, as the jury found, the WOLMER vehicle was not defective or in a condition unreasonably dangerous, it is preposterous to maintain that Chrysler had `actual knowledge' of something that was never even found to exist." As attractive as this notion may seem in the present setting, Chrysler has not cited, nor have we been able to locate, any authority to support this proposition. On the contrary, the cases are uniform in holding that a motion for a directed verdict requires the court to focus its attention on all of the evidence which must be evaluated in the light most favorable to the non-moving party. See Urling v. Helms Exterminators, Inc., 468 So.2d 451 (Fla. 1st DCA 1985); Smith v. Brantley, 455 So.2d 1063 (Fla. 2d DCA 1984), review denied, 462 So.2d 1107 (Fla. 1985); Maguire v. American Family Life Assurance Co., 442 So.2d 321 (Fla. 3d DCA 1983), review denied, 451 So.2d 849 (Fla. 1984); Whitten v. State Farm Fire & Casualty Co., 430 So.2d 528 (Fla. 4th DCA 1983); Ritz v. Florida Patients Compensation Fund, 436 So.2d 987 (Fla. 5th DCA 1983), review denied, 450 So.2d 488 (Fla. 1984).
Perhaps, by making the above argument, Chrysler is actually attempting to claim that the jury's findings are internally inconsistent with each other. If so, we cannot consider that contention because it was not raised in the trial court. See Wiggs & Maale Construction Co. v. Harris, 348 So.2d 914 (Fla. 1st DCA 1977); Gould v. National Bank of Florida, 421 So.2d 798 (Fla. 3d DCA 1982); Keyes Co. v. Rocky Graziani, Inc., 406 So.2d 100 (Fla. 3d DCA 1981). Moreover, a motion for a directed verdict is not the proper vehicle for challenging allegedly inconsistent verdicts. See Cutchins v. Seaboard Air Line Railroad, 101 So.2d 857 (Fla. 1958).

IV
As an alternative, Chrysler puts forth an argument which, in essence, suggests that the trial court was right for the wrong reason. It asserts that the punitive damage award constitutes an impermissible state regulation in a field that has been preempted by Congress. Pursuant to 15 U.S.C. § 1392(a), the Secretary of Transportation has promulgated a series of federal motor vehicle safety standards which constitute a mandatory scheme of regulation aimed at improving motor vehicle safety in the United States. In particular, standard 301 establishes the criteria for motor vehicle fuel systems. As Chrysler views it, the underlying premise of the plaintiff's case was that compliance with standard 301 was not enough to preclude liability for punitive damages. Thus, Chrysler contends that the punitive damage award requires a manufacturer to meet a higher standard than that specified by the federal government and, therefore, constitutes the establishment of a regulation which conflicts with the applicable motor vehicle standard. The plaintiff retorts that it never claimed Chrysler was reckless in failing to test at speeds greater than those required by standard 301. Rather, the plaintiff argues that even at 301's lower-speed tests, Chrysler obtained actual knowledge of what would happen in higher-speed collisions. Armed with this knowledge, Chrysler had a duty to implement remedial measures to protect purchasers.
"It is a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that `interfere with, or are contrary to' federal law." Hillsborough County v. Automated Medical Laboratories, Inc., ___ U.S. ___, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (quoting Gibbons v. Ogden, 9 Wheat. 1, 211, 6 L.Ed. 23 (1824)). Furthermore, it is equally well-established "that state laws can be preempted by federal regulations as well as by federal statutes." Ibid. In Elsworth v. Beech Aircraft Corp., 37 Cal.3d 504, 208 Cal. Rptr. 874, 878, 691 P.2d 630, 634 (1984), cert. denied, ___ U.S. ___, 105 S.Ct. 2345, 85 L.Ed.2d 861 (1985), the California Supreme Court dealt with a case much like the one at bar and there set forth the basic principles of preemption.
Under the doctrine of preemption, federal law prevails over state law if Congress *839 has expressed an intent to occupy a given field in which federal law is supreme. But even if there is no such intent, state law is preempted if it conflicts with federal law so that it is impossible to comply with both, or if the state regulations stand as an obstacle to the accomplishment of the full purposes that Congress sought to achieve. Courts are reluctant to infer preemption, and it is the burden of the party claiming that Congress intended to preempt state law to prove it.
(Citations omitted.) See also Central National Bank v. Central Bancorp, Inc., 411 So.2d 358 (Fla. 3d DCA 1982).
In the field of motor vehicle safety regulation, Congress has expressed its intent to allow the application of traditional tort remedies. Title 15 U.S.C. § 1397(c), provides that "[c]ompliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." (Emphasis supplied.) Had Congress desired to prohibit punitive damages, it would have said so. Accord Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984).
We are persuaded by the preemption analysis set forth in Elsworth v. Beech Aircraft Corp., supra, and conclude that the punitive damage award in the case at bar does not create an irreconcilable conflict with the federal regulatory scheme; nor will it frustrate the objectives of the federal regulatory plan. See Dorsey v. Honda Motor Co., supra; cf. Louisville & Nashville Railroad v. Hickman, 445 So.2d 1023 (Fla. 1st DCA 1983), review dismissed, 447 So.2d 887 (Fla. 1984). The Supreme Court noted in Silkwood v. Kerr-McGee, supra, that
there is a tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a state may nevertheless award damages based on its own law of liability. But... Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less.
In our view, the same tension permeates the case at bar. Congress, however, anticipated and approved its presence. Therefore, we conclude that the jury's decision to award punitive damages does not constitute an impermissible state regulation. Accordingly, we reverse the trial court's order granting Chrysler's renewed motion for a directed verdict and remand with instructions to reinstate the punitive damage award with interest from the date of judgment.
REVERSED AND REMANDED.
WALDEN, J., and NORRIS, WILLIAM A., Jr., Associate Judge, concur.