499 So.2d 823 (1986)
CHRYSLER CORPORATION, Etc., Petitioner,
v.
Jack E. WOLMER, Etc., Respondent.
No. 67761.
Supreme Court of Florida.
November 26, 1986.
Michael B. Davis of Davis, Critton, Hoy & Diamond, West Palm Beach, and Sheila L. Birnbaum of Skadden, Arps, Slate, Meagher & Folm, New York City, for petitioner.
Joel S. Perwin of Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin, P.A., Miami, and Haddad, Josephs & Jack, P.A., Coral Gables, for respondent.
Edward T. O'Donnell of Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, and David G. Owen, Columbia, S.C., amici curiae for The Product Liability Advisory *824 Counsel, Inc. and The Motor Vehicle Mfrs. Ass'n of the United States, Inc.
Joseph S. Kashi of Conrad, Scherer & James, Fort Lauderdale, amicus curiae for Florida Defense Lawyers Assn.
Timothy J. Corrigan of Bedell, Dittmar, DeVault, Pillans & Gentry, Jacksonville, amicus curiae for The Academy of Florida Trial Lawyers.
McDONALD, Chief Justice.
We have for review Wolmer v. Chrysler Corp., 474 So.2d 834 (Fla. 4th DCA 1985), which expressly and directly conflicts with Como Oil Co. v. O'Loughlin, 466 So.2d 1061 (Fla. 1985), White Construction Co. v. Dupont, 455 So.2d 1026 (Fla. 1984), and Carraway v. Revell, 116 So.2d 16 (Fla. 1959). This Court has jurisdiction pursuant to article V, section 3(b)(3), Florida Constitution. The issue is what type of conduct a party must demonstrate in order to justify the imposition of punitive damages. We reaffirm what we recently said in Como Oil and White, wherein we applied Carraway, and quash the opinion of the district court.
This case involves an award of punitive damages against an automobile manufacturer in a wrongful death action. The record shows that Jack Wolmer purchased a new Plymouth Volare station wagon, manufactured by Chrysler Corporation, in October 1976. On September 27, 1977 his wife, Mary Wolmer, was riding in the back seat of the station wagon when a pickup truck, traveling at fifty-five miles per hour, hit the station wagon from behind. The Volare's fuel tank exploded on impact and Mrs. Wolmer was burned to death. Mr. Wolmer sued Chrysler on negligence and strict liability grounds. At trial, following the close of evidence, Chrysler renewed an earlier motion for a directed verdict. The trial court reserved ruling on the motion and submitted the case to the jury. The jury found for Wolmer on the negligence count, but found for Chrysler on the strict liability count. The jury assessed compensatory damages at $500,000 for Wolmer and $500,000 for the estate. It further assessed punitive damages of $3,000,000. Thereafter, the trial court ordered a remittitur of $300,000 from the $500,000 compensatory verdict for the estate or, in the alternative, a new trial on that issue. Wolmer agreed to the remittitur. The trial court later entered a second order granting Chrysler's renewed motion for a directed verdict on the issue of punitive damages. On appeal the district court reversed the second order and remanded with instructions to reinstate the punitive damage award with interest from the date of judgment. We disagree with the district court.
Chrysler raises a number of arguments against the district court's decision to reinstate the punitive damage award. We begin by examining Chrysler's contention that the court applied an erroneous standard when it examined the propriety of the punitive damage awards. In Carraway this Court made it clear that the character of negligence necessary to sustain an award of punitive damages is the same as that required to sustain a conviction for manslaughter. 116 So.2d at 20. A showing of even gross negligence, the degree of negligence that lies between ordinary negligence and willful and wanton conduct, is not enough. Id.; Como Oil Co., 466 So.2d at 1062; White Construction Co., 455 So.2d at 1028; U.S. Concrete Pipe Co. v. Bould, 437 So.2d 1061 (Fla. 1983). Carraway stated:
The character of negligence necessary to sustain an award of punitive damages must be of "a gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them."
*825 116 So.2d at 20, n. 12. Recently, we reaffirmed this language in White Construction Co., 455 So.2d at 1029.
While the district court began its analysis by acknowledging the applicability of the Carraway standard, it then adopted what it viewed to be a restatement of that standard for product liability cases. Adopting language from Johns-Manville Sales Corp. v. Janssens, 463 So.2d 242 (Fla. 1st DCA 1984), review denied, 467 So.2d 999 (Fla. 1985), the district court stated:
A legal basis for punitive damages is established in products liability cases where the manufacturer is shown to have knowledge that its product is inherently dangerous to persons or property and that its continued use is likely to cause injury or death, but nevertheless continues to market the product without making feasible modifications to eliminate the danger or making adequate disclosure and warning of such danger.
474 So.2d at 836.
This pronouncement was made in the factual context of Johns-Manville. In that case the company learned of the higher probability of danger to thousands of persons manufacturing and using asbestos products over a period of years and, despite that knowledge, made conscious decisions at the executive level not to disclose the presence of this danger nor to alert affected individuals to the potential injuries that could result from such exposure over a long period of time. 463 So.2d at 250-51. In Johns-Manville the district court determined this conduct to be of a character evincing a reckless disregard for human life or the safety of persons exposed to its dangerous effect, which supports a finding by the jury of a conscious indifference to consequences, wantonness, recklessness, and a grossly careless disregard of the safety and welfare of members of the public. Translated into the facts of the instant case, no justification for the use of the Johns-Manville standard exists.
Punitive damages are imposed in order to punish the defendant for extreme wrongdoing and to deter others from engaging in similar conduct. Mercury Motors Express, Inc. v. Smith, 393 So.2d 545 (Fla. 1981). They are not intended as a means by which a plaintiff can recover extra damages. Thus, punitive damages are warranted only where the egregious wrongdoing of the defendant, although perhaps not covered by criminal law, nevertheless constitutes a public wrong. Arab Termite & Pest Control, Inc. v. Jenkins, 409 So.2d 1039 (Fla. 1982). Therefore, the question that must be answered utilizing the Carraway standard is whether Chrysler exhibited a reckless disregard for human life equivalent to manslaughter by designing and marketing the Volare.
To support its reinstatement of the punitive damage award, the district court undertook an extensive examination of two alleged design defects in the 1977 Volare station wagon. The court discussed both the nature of these alleged defects as well as the results of certain crash tests that Chrysler conducted on the automobile. A brief summary of that discussion is warranted here.
Chrysler designed the Volare's fuel tank so that, in the event of a rear-end collision, the tank would push forward and upward. If struck with sufficient force, the fuel tank would ride over the differential and impact against the shock absorber. In the Wolmer collision, the rear end of the pickup truck struck the rear end of the Volare with enough force that the shock absorber broke off and punctured the fuel tank as it moved forward. This puncture caused gasoline to spray from the tank, thereby fueling the accompanying explosion.
A second design characteristic involved the fuel filler tube which extended from the gas cap on the left rear quarter panel into the fuel tank. Chrysler designed the filler tube with a fixed connection at the gas cap end rather than with a breakaway connection. Where the filler tube entered into the fuel tank, a donut-shaped rubber grommet held the tube in place. Due to this design, if the rear quarter panel deflected outward during a collision, the filler *826 tube would also pull outward. If the panel moved a sufficient distance, the tube would pull completely away from the tank, causing a fuel spillage. This occurred during the Wolmer collision.
Chrysler does not deny that both of these design characteristics had a causal relationship to the fire that consumed Mary Wolmer. Chrysler, however, maintains that the district court erred in finding that the evidence supported the inference that Chrysler had actual knowledge that the fuel system was inherently dangerous. We agree. Although the district court interpreted the results from crash tests on the 1977 Volare station wagon as putting Chrysler on notice of the fuel system defects, a closer reading of these test results does not support this interpretation.
The National Traffic Motor Vehicle Safety Act of 1966, 15 U.S.C. §§ 1381-1431 (1976), requires the Secretary of Transportation to prescribe safety standards for motor vehicles which both meet the need for motor vehicle safety and are reasonable, practicable, and appropriate. 15 U.S.C. § 1392(a) & (f)(3) (1976). Among the standards promulgated under the act is standard 301-75, which deals with fuel system integrity. 49 C.F.R. § 581.301-75 (1976). Under standard 301-75, a fuel system in a stationary vehicle hit from the rear by a 4,000-pound barrier moving at thirty miles per hour can lose no more than one ounce of fuel in the first minute following the collision and no more than five ounces of fuel in the first five minutes following the collision. 49 C.F.R. § 571.301, S5.5 (1976). The evidence is uncontroverted that Chrysler tested its product and that the fuel system in the 1977 Plymouth Volare station wagon satisfied these performance standards during its compliance test.
Moreover, test reports included in the record indicate that, while fuel leakage due to filler tube failure did occur during some of the crash tests conducted on the Volare, fuel tank movement that occurred due to the failure of the tank's retention straps triggered these leakages. Because Chrysler subsequently corrected the strap design problem, this potential defect was not present on the automobile sold to Wolmer. Also, while some leakage did occur during at least one rollover test, the Wolmer accident did not involve such a rollover and thus the results of that test are not damning to Chrysler. Likewise, while some of the crash tests conducted prior to the sale of the Wolmer car indicated contact between the fuel tank and the shock absorber, the contact had always been "friendly" and had never threatened the integrity of the fuel tank. Therefore, even when viewed in the light most favorable to Wolmer, the test reports do not support the district court's determination that Chrysler had actual knowledge that it was marketing an inherently dangerous automobile.[1] Nor does any reasonable view of the evidence support the conclusion that Chrysler acted with a wanton disregard for life equivalent to manslaughter. Therefore, an award of punitive damages in this case not only is unjust, but also ignores the threshold requirements for such an award. See Como Oil Co., 466 So.2d at 1062; White Construction Co., 466 So.2d at 1028; Carraway, 116 So.2d at 20. While we refrain from addressing the propriety of the Johns-Manville standard as applied to inherently dangerous products such as the asbestos involved in Johns-Manville because that question is not before us, we find that standard to be clearly erroneous when applied to a claim that a motor vehicle was insufficiently crashworthy when precautions had been taken to insure its crashworthiness.
In light of the above, we need not address the other issues raised by Chrysler.[2] *827 Accordingly, we quash the opinion of the district court and remand for proceedings consistent with this opinion.
It is so ordered.
BOYD, OVERTON, and EHRLICH, JJ., concur.
ADKINS, J., dissents with an opinion, in which SHAW, J., concurs.
BARKETT, J., dissents with an opinion.
ADKINS, Justice, dissenting.
While I agree with the majority that we have jurisdiction to review the district court's application of the punitive damages standard announced in Como Oil, White, and Carraway, I find the jury's and district court's imposition of punitive damages proper in this case. The jury found that Chrysler acted "with wantonness, wilfullness, or reckless indifference to the rights of others," 474 So.2d at 835, and such a finding is amply supported by a fair review of the evidence.
The plaintiffs at trial established through testimonial and documentary evidence that Chrysler marketed the car knowing that it contained defects in design likely to cause death or serious injury. Tests conducted at speeds of thirty miles per hour revealed to Chrysler problems with the car's design which it knew, or should have known, would result in disaster at normal highway speeds. A qualified expert testified that failure to conduct more accurate tests after being put on such notice constituted "an atrocious violation of accepted practices in safety engineering" demonstrating "a reckless disregard for safety." Id. at 837.
In spite of Chrysler's admission that "both of these design characteristics had a causal relationship to the fire that consumed Mary Wolmer," Maj. op. at 826, the majority engages in an unwarranted "closer reading of these test results." Id. The majority apparently turns to a strained application of the National Traffic Motor Vehicle Safety Act and a slanted reading of Chrysler's tests in order to overturn the duly considered judgment of the finder of fact at trial and the district court. This is not the task properly before it, and obfuscation is bound to result when a standard announcing a rule of law, such as punitive damages in this case, is twisted to produce a particular result in an individual case.
I must therefore dissent.
SHAW, J., concurs.
BARKETT, Justice, dissenting.
I do not believe conflict exists to provide jurisdiction in this case. In Nielsen v. City of Sarasota, 117 So.2d 731, 734 (Fla. 1960), this Court explained:
While conceivably there may be other circumstances, the principal situations justifying the invocation of our jurisdiction to review decisions of Courts of Appeal because of alleged conflicts are, (1) the announcement of a rule of law which conflicts with a rule previously announced by this Court, or (2) the application of a rule of law to produce a different result in a case which involves substantially the same controlling facts as a prior case disposed of by this Court. Under the first situation the facts are immaterial. It is the announcement of a conflicting rule of law that conveys jurisdiction to us to review the decision of the Court of Appeal. Under the second situation the controlling facts become vital and our jurisdiction may be asserted only where the Court of Appeal has applied a recognized rule of law to reach a conflicting conclusion in a case involving substantially the same controlling facts as were involved in allegedly conflicting prior decisions of this Court. Florida Power & Light Co. v. Bell, Fla. 1959, 113 So.2d 697.
The majority of this Court finds conflict between the instant case and Como Oil Co. v. O'Loughlin, 466 So.2d 1061 (Fla. 1985); White Construction Co. v. Dupont, 455 So.2d 1026 (Fla. 1984); and Carraway v. Revell, 116 So.2d 16 (Fla. 1959). As the *828 majority acknowledges, however, the district court expressly recognized that the Carraway standard regarding punitive damages applied. The majority "creates" conflict by inferring that the district court, in using language from Johns-Manville Sales Corp. v. Janssens, 463 So.2d 242 (Fla. 1st DCA 1984), review denied, 467 So.2d 999 (Fla. 1985), adopted a new standard. I fail to see any distinction between the standard in Carraway, 116 So.2d at 20 n. 12, that
negligence ... must be of "a gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them"
and the standard enunciated in Johns-Manville, 463 So.2d at 249, that
A legal basis for punitive damages is established .. . where the manufacturer ... [has] knowledge that its product is inherently dangerous to persons or property and that its continued use is likely to cause injury or death, but nevertheless continues to market the product... .
Continuing to market a product in a condition which the manufacturer knows is "inherently dangerous ... and ... is likely to cause injury or death" must surely be considered the same as "evincing reckless disregard of human life, or ... reckless indifference to the rights of others which is equivalent to an intentional violation of them." Thus, I see no "rule of law" conflict between the instant case and other district court or Supreme Court cases.
In addition, this is not a case in which the court below reached a different result than that reached in other district court or Supreme Court cases involving the same controlling facts. The facts in this case are distinguishable from those in O'Loughlin, White Construction, and Carraway. Thus, there is no express and direct conflict. See Department of Revenue v. Johnston, 442 So.2d 950 (Fla. 1983) (where cause was before court on apparent conflict, but cause was distinguishable on its facts, Supreme Court would discharge jurisdiction). This Court is simply affording the parties a second appeal which is inappropriate and contrary to prior decisions of this Court. See Jenkins v. State, 385 So.2d 1356, 1357 (Fla. 1980) (quoting from Ansin v. Thurston, 101 So.2d 808, 810 (Fla. 1958) (the district courts of appeal were not intended to be intermediate courts)). The facts presented in the district court opinion reflect sufficient evidence to submit the question of punitive damages to the jury:
As a predicate for punitive damages, the plaintiff introduced testimonial and documentary evidence to show that Chrysler marketed the '77 Volare station wagon knowing that it contained defects likely to cause death or serious injury. Part of this proof came from Chrysler's own records. In an effort to demonstrate compliance with a government-imposed standard, Chrysler conducted a series of crash tests simulating rear-end collisions. These tests consisted of striking the back end of a Chrysler vehicle with a 4000-pound moving barrier traveling at thirty miles per hour. Test reports revealed contact problems between the fuel tank and shock absorber. Also, there were problems of fuel leakage from the filler tube. The reports evidenced Chrysler's actual knowledge of both problems. One of the plaintiff's expert witnesses testified that in light of the difficulties encountered by Chrysler during the crash tests, it was obligated to conduct additional crash tests at higher speeds. The same witness said that Chrysler's failure to do more testing constituted "an atrocious violation of accepted practices in safety engineering" which demonstrated "a reckless disregard for safety." A second expert witness testified that Chrysler's crash tests made it "clearly foreseeable" that the fuel tank would impact with the shock absorber if *829 the station wagon were involved in a rear-end collision at normal highway speeds. This witness said that as speeds increased beyond the 30-mile-an-hour test range, the likelihood of a breach in the fuel system was "very great." While the tests demonstrated compliance with the government's minimum standard, predictive analysis would indicate "fuel system compromise" at higher speeds. Indeed, a Chrysler inter-office memorandum, dated September 9, 1976,  a month prior to the sale of the Wolmers' station wagon  stated that several Chrysler models, including the '77 Volare station wagon, "marginally meet the [government-mandated] fuel system requirements...."
The foregoing evidence, when viewed in the light most favorable to the plaintiff, would permit a jury to reasonably infer that Chrysler had actual knowledge that the fuel system in the 1977 Volare station wagon was inherently dangerous to life and limb and, still, continued to market the vehicle. Thus, there was sufficient evidence to let the issue of punitive damages go to the jury.
474 So.2d at 837. Compare O'Loughlin, 466 So.2d at 1061-62; White Construction, 455 So.2d at 1028.
I see no basis for conflict jurisdiction. Accordingly, I dissent.
NOTES
[1] Although an automobile has long been held to be a dangerous instrumentality, it is not inherently dangerous in and of itself. Rather, an automobile is dangerous only in its use and operation. Lollie v. General Motors Corp., 407 So.2d 613 (Fla. 1st DCA 1981), review denied, 413 So.2d 876 (Fla. 1982).
[2] Specifically, we do not reach the issue of whether the National Traffic Motor Vehicle Safety Act preempts the state common law remedy of punitive damages.