NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

WINTER HAVEN HOSPITAL, INC.,　　　　)
a Florida corporation,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Appellant,　　　　　　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　)　　Case No. 2D13-807
　　　　　　　　　　　　　　　　　　)
BRANDY K. LILES,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Appellee.　　　　　　)
_____　)


Opinion filed October 8, 2014.

Appeal from the Circuit Court for Polk
County; J. Dale Durrance, Judge.

Susan W. Fox of Fox & Loquasto, P.A.,
Orlando; G. Bruce Hill and Thomas
Schieffelin of Hill, Adams, Hall &
Schieffelin, P.A., Winter Park; and Daniel
A. Martinez and Inguna Varslavane-Callahan
of Martinez Denbo, LLC, St. Petersburg, for
Appellant.

Joel D. Eaton of Podhurst Orseck, P.A.,
Miami; and Weldon Earl Brennan of
Brennan, Holden & Kavouklis, P.A., Tampa,
for Appellee.


MORRIS, Judge.

Winter Haven Hospital, Inc. (the Hospital), appeals a final judgment awarding Brandy Liles $500,000 in compensatory damages against the Hospital and $1,000,000 in punitive damages against the Hospital. We reverse the final judgment and remand for a new trial in accordance with this opinion.

I. Facts

Ms. Sutka, a forty-nine-year-old woman, was receiving treatment at the Hospital's emergency room on March 26, 2005, for shortness of breath and abdominal pain. Early in the morning on March 27, Ms. Sutka passed away. Ms. Sutka's daughter, Brandy Liles, requested an autopsy to determine Ms. Sutka's cause of death. Ms. Liles signed the Hospital's autopsy permission form, which provides as follows:

> Permission is granted to the authorities of Winter Haven Hospital, Inc., to perform a postmortem examination and to retain such tissues and organs as may be deemed necessary for further study on the remains of the above named decedent. Due care will be taken on the part of the hospital authorities to avoid mutilation or disfigurement of the body.

Dr. Gordon, a partner in Ridge Pathology Consultants, performed the autopsy, but when Ms. Liles received the report, she did not agree with the cause of death as determined by Dr. Gordon. She inquired about a second autopsy at the funeral home that was handling her mother's burial, but Ms. Liles was told that her mother's internal organs had not been returned to the funeral home after the autopsy. Ms. Liles contacted the Hospital and learned that her mother's organs had been incinerated.

Ms. Liles filed a complaint against the Hospital, Dr. Gordon, and Ridge Pathology, alleging separate counts of outrage against Dr. Gordon, Ridge Pathology,

and the Hospital based on the disposal and incineration of Ms. Sutka's organs without the express consent of Ms. Liles. She also alleged one count of conspiracy against Dr. Gordon, Ridge Pathology, and the Hospital and separate counts of vicarious liability against Ridge Pathology and the Hospital for the actions of Dr. Gordon. The Hospital filed a motion to dismiss, arguing that Ms. Liles had failed to comply with the medical malpractice statutes of chapter 766, Florida Statutes (2004). The trial court denied the Hospital's motion to dismiss. The trial court subsequently granted Ms. Liles' motion to add claims for punitive damages against Dr. Gordon, Ridge Pathology, and the Hospital.

At trial, Dr. Gordon's video deposition was played for the jury. He had been a private practicing pathologist at the Hospital for twenty-nine years. During this time, his regular practice had been to dispose of the organs tested during the autopsy by placing them in red biohazard bags, which are later collected and incinerated. He had also worked at the University of Florida for four years, where they also disposed of organs this way. Dr. Gordon received Ms. Sutka's medical chart and the autopsy permission form signed by Ms. Liles, and he contacted Ms. Sutka's attending physician to discuss the case with him; Dr. Gordon did not discuss the case with Ms. Sutka's family, and he was not aware of any specific wishes of the family. Dr. Gordon stated that the family had a right to request the return of Ms. Sutka's organs and that he would have honored that request if he had received it. When the funeral home contacted him for Ms. Sutka's organs, this was the first time in thirty-four years that a family had requested the organs. He did not intend to hurt Ms. Liles when he disposed of Ms.

Sutka's organs, and he did not believe he had done anything wrong or reckless in disposing of the organs as he had been doing for over thirty years.

Two employees of the Hospital testified regarding the Hospital's autopsy policy, which provides that "[h]istology staff will . . . call Environmental Services to meet them in the morgue to pick up organs removed during the autopsy which have been placed in red biohazard bags by the Pathologists. Environmental Services will transport the organs to the incinerator for disposal." One of the employees testified that to her knowledge, the policy of incinerating the removed organs was not made known to families before the autopsies are conducted.

An environmental services employee of the Hospital testified that the red biohazard bags are collected along with the other hospital waste and incinerated on site along with the other waste. The ashes from the incinerator are then sent to a landfill.

A former nurse at the Hospital testified that she had Ms. Liles sign the autopsy consent form at the direction of the attending physician. The nurse had Ms. Liles read the form by herself and sign it; the nurse did not explain the form to Ms. Liles. The nurse had no memory of any discussion she might have had with Ms. Liles.

Ms. Liles presented the testimony of Dr. Nelson, a pathologist and chief medical examiner for Polk, Hardee, and Highlands Counties. He stated that his office always returns internal organs to the body after conducting an autopsy. He usually does not deal with consent forms for autopsies, but the form he uses informs the family that organs may be retained and disposed of and that the family may object. If the family wants to have the funeral before he is finished with the organs, the family receives the body without the organs. He also testified regarding the disposal of

biomedical waste and that it "is not proper for human materials to be mixed with garbage or trash":

> Those specimens, those materials from the body, are handled differently. They are not mixed with the garbage or with the trash. They are put in separate red biohazardous waste bags, and they are incinerated by the hazardous waste hauler. They're not taken to the landfill and dumped with the garbage pickup that you have at the curb.

He believed that the consent form used by the Hospital was deficient because it did not "spell out exactly what's going to take place after the autopsy, with various organs and tissues." He conceded that the consent form in this case meets the requirement of section 872.04, Florida Statutes (2004), which simply requires written consent and is the only law applicable to private autopsies. Dr. Nelson also agreed that organs that have been examined during an autopsy become biohazardous waste and that incineration of such waste is the most common practice and is necessary for public health. Dr. Nelson agreed that not all facilities put the organs back into the body. He also agreed that the Florida Association of Medical Examiners guidelines provide that retained organs are not customarily returned to the body for burial and should be treated as biomedical waste.

Dr. Nelson stated that the lack of informed consent and the way the Hospital disposed of Ms. Sutka's organs was outrageous. But he stated that Dr. Gordon had performed the autopsy in a manner that was compliant with the applicable standard of care, and he did not believe that Dr. Gordon performed the autopsy so as to inflict emotional distress on Ms. Liles. He stated that mixing the internal remains with other trash without consent of the family is mutilation of the body, but he agreed that blood is often flushed down the sewer during embalming. Dr. Nelson believed that the attending

physician is responsible for obtaining consent for an autopsy from the family; the pathologist is not involved in that process.

The funeral director who received Ms. Sutka's body testified that Ms. Liles was upset when she found out that a second autopsy could not be performed, not because she could not give her mother a proper burial. He had received bodies from the Hospital both with and without organs, but he had never received bodies without organs from other hospitals.

Ms. Liles testified that after speaking with her mother's attending physician, she requested an autopsy to learn why her mother died. When she signed the consent form at the nurses' station, no one told her that her mother's organs would not be returned to the body. If they had told her, she would not have signed the form. She did inform several people that she did not want her mother cremated. Ms. Liles had requested a second autopsy because she did not agree with Dr. Gordon's conclusions regarding her mother's cause of death; she believed her mother was perfectly healthy and did not die of natural causes. She was devastated when she learned that the organs had been incinerated because she could not keep her promise to her mother that her mother would not be cremated. She has not been able to find peace due to her not being able to honor her mother's final wishes. She also testified that she became even more upset when she learned the week before trial that her mother's organs were "in a landfill somewhere, with no telling what else garbage I've heard." She said that when she goes on her lunch break and sees the garbage can marked "waste," she cannot eat because she thinks of where her mother is. She conceded that her mother may have already been buried when she contacted the

funeral home about a second autopsy. Ms. Liles admitted to being aware from the consent form that her mother's organs could be retained for further study or research.

Ms. Liles also presented evidence that a sample autopsy consent form promulgated by the College of American Pathologists (CAP) gives the next of kin the right to object to the retention of organs and informs the next of kin that organs will be disposed of as the pathologist or hospital determines or as required by law.

The Hospital presented the testimony of Dr. Davis, a pathologist and professor at the University of Kentucky College of Medicine and a state medical examiner for Kentucky. He testified that Dr. Gordon's handling of the organs as biohazardous materials was "[a]bsolutely" appropriate and within accepted standards. Organs removed during an autopsy are biohazardous and are ultimately incinerated as medical waste. This was done at other hospitals where he has served and is the standard procedure around the country. Dr. Davis did not believe that there was anything reckless about the consent form used in this case; it is "reasonable" and "better than some [he had] seen around the country." He had had only one family in thirty-one years request that the organs be returned to the body. He testified that the attending physician handles the autopsy issue with the family and that the pathologist plays no role in that. Dr. Davis testified that the CAP consent form is offered as a starting point and that the CAP "does not order pathologists how to do this." The CAP consent form is not a policy of the CAP. Dr. Davis had been a member of the CAP committee that created the sample CAP consent form. Over the Hospital's objection, Dr. Davis was questioned regarding the cremation statute and the fact that Ms. Liles

-7-

had not signed a written authorization for cremation, although he believed that "cremation means the entirety of the body, with or without internal organs."

Dr. Gordon testified that during an autopsy, organs are dissected and the field is "unavoidably tainted with mucous, bowel, blood, serum and urine and feces, or traces of it." The autopsy creates a nonsterile field. After he has completed the dissection and sampling of the organs, they are placed into red biohazard bags. The bags are placed in coolers and later picked up for incineration. Upon his examination of Ms. Sutka, he found pneumonia, bleeding in the lungs, acute and chronic kidney infection, chronic tobacco use, enlarged heart and liver, and sleep apnea. Ms. Sutka was 5'1" tall and weighed 330 pounds. He listed the official cause of death as "respiratory arrest, secondary to desquamative interstitial pnuemonia, with pulmonary hemorrhage, possibly complicated by sleep apnea and morbid obesity, DIP, secondary to smoking." Dr. Gordon admitted that after this incident, he now places all organs in a red biohazard bag and places the bags with the body for shipment to the funeral home, although Dr. Gordon believes that the safest practice is to dispose of the biohazardous waste in the autopsy room so as to avoid the handling by multiple people of materials that are potentially infected. He believes that an inherent part of the autopsy is the incineration of internal organs as biohazardous waste and that even organs that are retained for further study must be disposed of eventually.

Before Ms. Sutka's case, Dr. Gordon had not had a family request the examined organs in all of the years he had been a practicing pathologist. He believed that his disposal of the organs was "appropriate and within the standard of care" and was in accordance with the way he was taught at the University of Florida.

Dr. Gordon and Ridge Pathology Consultants presented the testimony of Dr. Strickland, a pathologist at Bay Pines VA Healthcare System and an assistant clinical professor of pathology at the University of South Florida College of Medicine. Dr. Strickland believed that Dr. Gordon's autopsy of Ms. Sutka and his disposal of the organs for incineration met the applicable standard of care and was not reckless or outrageous. Dr. Gordon's handling of the organs was consistent with the way Dr. Strickland would practice. Dr. Strickland had never had a family member inquire about the organs removed as part of the autopsy process. In his experience in practice and in teaching hospitals, the organs are retained and disposed of as medical waste by incineration, which is the most common and cost-effective way of disposal. He believed that this is in accordance with Florida law, which ensures that the waste is not a danger to the public. The Hospital's consent form contains all the required elements and is consistent with other forms he has seen; Dr. Strickland believed that disposal of the organs is implicit in the form. Dr. Strickland admitted that the consent form he uses gives the next of kin the right to object to retention of organs. Over the Hospital's objection, Dr. Strickland was also asked about the cremation statute and the fact that written authorization for cremation is required.

At the close of the evidence, the Hospital argued motions for directed verdicts on the issues of outrage, punitive damages, and the vicarious liability of the Hospital for Dr. Gordon's actions. The trial court denied the Hospital's motions.

The jury found that Dr. Gordon, Ridge Pathology, and the Hospital engaged in "extreme and outrageous conduct [that] was a legal cause of severe emotional distress" to Ms. Liles (the tort of outrage) but found in favor of Dr. Gordon,

Ridge Pathology, and the Hospital on the conspiracy count. The jury also found that the Hospital owed a duty to Ms. Liles for the acts of Dr. Gordon and that Dr. Gordon was acting as an agent of the Hospital and in the scope of Dr. Gordon's authority. The jury awarded compensatory damages for past severe emotional distress in the amount of $1,000,000. The jury also found that punitive damages were warranted against the Hospital in the amount of $1,000,000 and against Ridge Pathology in the amount of $90,000 but that punitive damages were not warranted against Dr. Gordon.

After the jury verdict, Ms. Liles settled with Dr. Gordon and Ridge Pathology and voluntarily dismissed her claims against Dr. Gordon and Ridge Pathology with prejudice. The trial court entered a final judgment against the Hospital and in favor of Ms. Liles for $500,000 in compensatory damages and for $1,000,000 in punitive damages. The Hospital now appeals.

II. Analysis

A. Medical malpractice

The Hospital first argues that the trial court erred in failing to treat this case as a medical malpractice case subject to the provisions of chapter 766. We disagree.

Section 766.106(1)(a), Florida Statutes (2004), defines a "[c]laim for medical negligence" or "claim for medical malpractice" as "a claim, arising out of the rendering of, or the failure to render, medical care or services." In addition, the medical negligence or malpractice must have resulted in personal injury or death to the claimant. § 766.104(1) ("No action shall be filed for personal injury or wrongful death arising out of medical negligence . . . unless . . . there are grounds for a good faith belief that there

-10-

has been negligence in the care or treatment of the claimant."). The autopsy performed by Dr. Gordon did not constitute the rendering of medical care or services. And while an autopsy requires the exercise of medical skill and judgment, Ms. Liles' claim is based on the disposal of her mother's organs, which does not require medical skill and judgment. See Bell v. Indian River Mem'l Hosp., 778 So. 2d 1030, 1034 (Fla. 4th DCA 2001) (holding that parents' claims of outrage and negligent handling of a body were not subject to the medical malpractice statutes because "hospital personnel did not engage in any medical skill or judgment in the disposition of the child's remains"); Liles v. P.I.A. Medfield, Inc., 681 So. 2d 711, 712 (Fla. 2d DCA 1995) (holding that plaintiff's claim that medical providers did not comply with Baker Act was not subject to medical malpractice statutes; "[a]lthough a medical diagnosis is necessary in order to involuntarily commit a patient, the process of complying with the statute does not require medical skill or judgment"). Furthermore, Ms. Liles, who was not a patient, seeks compensation for damages she suffered as a result of the incineration of her mother's organs, not for any injury or death suffered by her mother, the patient. See Reeves v. N. Broward Hosp. Dist., 821 So. 2d 319, 322 (Fla. 4th DCA 2002) ("[N]ot every alleged wrongful act by a healthcare provider, or its employee, amounts to medical malpractice. The alleged wrongful act must be directly related to the improper application of medical services to the patient and the use of professional judgment or skill. It is undisputed that [plaintiff] received no medical services from the Hospital that required the use of professional judgment or skill." (citation omitted)). For these reasons, the trial court properly determined that this is not a case of medical malpractice subject to the requirements of chapter 766.

-11-

B.  Cremation instruction

The Hospital further claims that the trial court erred in instructing the jury, over the Hospital's objection, that "[a] cremation may not be performed until a legally authorized person gives written authorization for such cremation."  This sentence comes directly from section 470.0255, Florida Statutes (2004), which addresses the arrangement, authorization, and time requirements for a cremation to be performed.[1]  The Hospital claims that the cremation statutes do not apply because organs removed from a body during an autopsy are biomedical waste excluded from the cremation statutes.  The Hospital argues that the cremation procedures are meant for funeral homes and crematoriums and do not apply to the incineration of internal organs in a medical setting.

Cremation is defined as "any mechanical or thermal process whereby a dead human body is reduced to ashes and bone fragments.  Cremation also includes any other mechanical or thermal process whereby human remains are pulverized, burned, recremated, or otherwise further reduced in size or quantity."  § 470.002(24).  Human remains "means the body of a deceased human person for which a death certificate . . . is required . . . and includes the body in any stage of decomposition and the residue of cremated human bodies."  § 470.002(23).[2]

---

[1]Section 470.0255 was renumbered to section 497.607 effective October 1, 2005.  Ch. 2004-301, § 132, at 2089, Laws of Fla.  Chapter 470 addressed funeral directing, embalming, and direct disposition, and these services are now governed by chapter 497.

[2]Section 470.002 was repealed effective October 1, 2005, ch. 2004-301, § 157, at 2103, Laws of Fla. (effective Oct. 1, 2005), and these terms are now defined in section 497.005.

Dr. Gordon testified that Ms. Sutka's organs were disposed of and incinerated as biomedical or biohazardous waste. "Biomedical waste" is "any solid or liquid waste which may present a threat of infection to humans." § 381.0098(2)(a), Fla. Stat. (2004). It includes "nonliquid human tissue and body parts" but "does not include human remains that are disposed of by persons licensed under chapter 470," such as funeral directors, embalmers, and direct disposers. § 381.0098(2)(a).[3] Biomedical waste must be handled, treated, and disposed of according to the law set forth in section 381.0098 and the regulations set forth by the Departments of Health and Environmental Protection. § 381.0098(1).[4]

We agree that the trial court erred in applying the law regarding cremation because Ms. Sutka's organs do not constitute a "dead human body" as set forth in 470.002(24) or "human remains" as defined in section 470.002(23).[5] As Dr. Davis aptly explained, the term cremation applies to "the entirety of the body, with or without internal organs." And the testimony established that after the organs were dissected and examined during the autopsy, they constituted biomedical waste. The Hospital was

[3]Section 381.0098(2)(a) was amended to refer to chapter 497. Ch. 2004-301, § 137, at 2095, Laws of Fla. (effective Oct. 1, 2005).

[4]Biomedical waste must be treated "by steam, incineration, or an [approved] alternative process" by the Department of Health prior to disposal, and "[i]ncineration of biomedical waste shall be achieved in a biological waste incinerator permitted by the Department of Environmental Protection." Fla. Admin. Code R. 64E-16.007(1), (3).

[5]We note that the legislature added a list of the licenses that may be issued under chapter 497. See § 497.141, Fla. Stat. (2005); ch. 2004-301, § 11, at 1957-59, Laws of Fla. (effective Oct. 1, 2005). The procedures for cremations apply to "any person licensed pursuant to this chapter." § 470.0255, Fla. Stat. (2004); § 497.607, Fla. Stat. (2005). Hospitals or pathologists performing autopsies are not included in the list of chapter 497 licenses.

harmed by the incorrect cremation instruction because the facts were undisputed that Ms. Liles had not given written consent for cremation and because Ms. Liles was permitted to question key witnesses regarding the consent required for cremation and the lack of such consent in this case.

### C. Tort of outrage

The Hospital further argues that Ms. Liles failed to demonstrate the elements of the tort of outrage (intentional infliction of emotional distress).

> The elements of the tort of [outrage] are:
>
> (1) The wrongdoer's conduct was intentional or reckless, that is, he intended his behavior when he knew or should have known that emotional distress would likely result;
>
> (2) the conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community;
>
> (3) the conduct caused emotion[al] distress; and
>
> (4) the emotional distress was severe.

Gallogly v. Rodriguez, 970 So. 2d 470, 471 (Fla. 2d DCA 2007) (second alteration in the original) (citing LeGrande v. Emmanuel, 889 So. 2d 991, 994-95 (Fla. 3d DCA 2004)). "Conduct claimed to cause severe emotional distress must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.' " Matsumoto v. Am. Burial & Cremation Servs., Inc., 949 So. 2d 1054, 1056 (Fla. 2d DCA 2006) (quoting Ponton v. Scarfone, 468 So. 2d 1009, 1011 (Fla. 2d DCA 1985)). "[T]he conduct must be evaluated on an objective basis to determine whether it is 'atrocious[] and utterly intolerable in a civilized community.' That determination is a question of law." Id. (quoting Ponton, 468 So. 2d at 1011) (citation omitted). In considering

-14-

whether the trial court should have granted a directed verdict on this issue, we " 'must evaluate the testimony in the light most favorable to the nonmoving party and every reasonable inference deduced from the evidence must be indulged in favor [of] the nonmoving party.' " GEICO Gen. Ins. Co. v. Hoy, 136 So. 3d 647, 651 (Fla. 2d DCA 2013) (quoting Sims v. Cristinzio, 898 So. 2d 1004, 1005 (Fla. 2d DCA 2005)).

The jury found that both Dr. Gordon and the Hospital had engaged in "extreme and outrageous conduct [that] was the legal cause of severe emotional distress to" Ms. Liles. The jury also found that the Hospital owed a nondelegable duty for the acts of Dr. Gordon and that Dr. Gordon was acting as an agent of the Hospital and within the scope of Dr. Gordon's authority. And Ms. Liles presented evidence regarding both Dr. Gordon's conduct and the Hospital's conduct before and after Dr. Gordon's involvement. Therefore, we must consider whether Ms. Liles presented sufficient evidence to support a finding of outrage against Dr. Gordon (for which the jury found the Hospital responsible) and whether she presented sufficient evidence to support a finding of outrage against the Hospital for the Hospital's own actions.

First, we conclude that there was no basis to support a finding of outrage against the Hospital for the actions of Dr. Gordon. Dr. Gordon received the autopsy permission form and medical chart but never spoke to Ms. Liles and was not aware of her wishes. Dr. Gordon had never had a family ask for the return of the organs; thus, he should not have known that Ms. Liles wished for her mother's organs to be returned. Dr. Gordon, Dr. Davis, and Dr. Strickland all testified that Dr. Gordon acted appropriately and within the acceptable standard of care in treating the organs as biomedical waste and not returning the organs to the body, as he had been doing for

-15-

over thirty years. Even Ms. Liles' expert, Dr. Nelson, testified that not all facilities return the organs to the bodies. Dr. Gordon testified that he did not mean to hurt Ms. Liles when he disposed of her mother's organs. And Dr. Nelson, Ms. Liles' expert, even testified that Dr. Gordon acted appropriately and that Dr. Nelson did not believe that Dr. Gordon intended to inflict emotional distress on Ms. Liles. Therefore, there was no evidence that Dr. Gordon's actions were outrageous and reckless or intentional.

However, we cannot conclude that there was no evidence to support the jury's finding of outrage against the Hospital for its actions independent of Dr. Gordon. Ms. Liles testified that she specifically informed the staff at the Hospital that she did not want her mother cremated, and the evidence was undisputed that the Hospital's policy was to incinerate organs that have been placed in red biohazard bags after an autopsy. The consent form failed to inform Ms. Liles that her mother's organs would be incinerated or how they would be incinerated. While cremation and incineration are treated differently under the law, Ms. Liles testified that she believes that her mother's organs were cremated against her mother's wishes. The environmental services employee of the Hospital testified that the biomedical waste was incinerated in the same incinerator with the Hospital's other trash. Dr. Nelson testified that this was outrageous conduct, and even Dr. Gordon testified that "[y]ou don't mix biohazardous material with non-biohazardous garbage" because it would be wrong and probably against the law. Ms. Liles specifically testified that she was upset by the fact that her mother's organs had been incinerated and that they had been mixed with trash. In light of this evidence regarding the Hospital's conduct, we cannot say that the trial court erred in submitting this limited issue to the jury. See Hoy, 136 So. 3d at 651 (" 'If there are conflicts in the

-16-

evidence or different reasonable inferences that may be drawn from the evidence, the issue is factual and should be submitted to the jury.' " (quoting Sims, 898 So. 2d at 1005)); Smith v. Telophase Nat'l Cremation Soc'y, Inc., 471 So. 2d 163, 166 (Fla. 2d DCA 1985) (affirming denial of crematorium's motion for directed verdict in case where jury found that crematorium committed tort of intentional infliction of emotional distress when it gave deceased's widow another person's ashes and scattered deceased's ashes at sea against his wishes; "it [is] within the province of the jury to find that the facts, and the proper inferences from the facts, establish that [crematorium's] conduct was extreme and outrageous"); see also Williams v. City of Minneola, 575 So. 2d 683, 691 (Fla. 5th DCA 1991) (recognizing that "our society . . . shows a particular solicitude for the emotional vulnerability of survivors regarding improper behavior toward" their dead loved one and that in such cases, "behavior which in other circumstances might be merely insulting, frivolous, or careless becomes indecent, outrageous[,] and intolerable").

D. Punitive damages

The Hospital argues that the award of punitive damages against the Hospital cannot stand based on the errors discussed above. We agree. But we note that Ms. Liles may be able to prove a claim for punitive damages on retrial for the Hospital's actions independent of Dr. Gordon. See § 768.72(2)(b), Fla. Stat. (2004); Chrysler Corp. v. Wolmer, 499 So. 2d 823, 825 (Fla. 1986).

III. Conclusion

The trial court should have entered a directed verdict in favor of the Hospital on the issue of whether the Hospital was liable for the actions of Dr. Gordon on

-17-

the tort of outrage.[6]  And the trial court erred in instructing the jury on the cremation statute, and this erroneous instruction was harmful to the Hospital.  Accordingly, we reverse the final judgment and remand for a new trial on Ms. Liles' claims for outrage and punitive damages against the Hospital for the Hospital's actions independent of Dr. Gordon.

Reversed and remanded.


DAVIS, C.J., and CASANUEVA, J., Concur.

---

[6]We note that the jury's verdict did not specify which damages were attributable to Dr. Gordon and which damages were attributable to the Hospital.  The jury awarded $1,000,000 in total compensatory damages to Ms. Liles, after finding all three defendants had committed the tort of outrage, but after Ms. Liles settled with Dr. Gordon and Ridge Pathology, the trial court entered the final judgment awarding Ms. Liles $500,000 in compensatory damages against the Hospital.  Of this $500,000 in compensatory damages, it is not clear what amount was based on the Hospital's liability for Dr. Gordon's actions or what amount was based on the Hospital's own conduct.