DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**TESLA, INC.** a/k/a **TESLA FLORIDA, INC.,**
Appellant,

v.

**KIM BANNER,** as Personal Representative of the **ESTATE OF JEREMY BANNER,**
Appellee.

No. 4D2023-3034

[February 26, 2025]

Appeal of a nonfinal order from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Reid P. Scott, II, Judge; L.T. Case No. 502019CA009962.

Laura N. Ferguson of Quinn Emanuel Urquhart & Sullivan LLP, Miami, Wendy F. Lumish of Bowman and Brooke LLP, Coral Gables, Derek L. Shaffer of Quinn Emanuel Urquhart & Sullivan LLP, Washington, DC, and Isaac N. Saidel-Goley of Quinn Emanuel Urquhart & Sullivan LLP, Boston, MA, for appellant.

Marc B. Hernandez, Lake H. Lytal, III, and Daniel C. Jensen of Lytal, Reiter, Smith, Ivey & Fronrath, West Palm Beach, for appellee.

KUNTZ, J.

Tesla, Inc. appeals from the circuit court's order granting the Estate of Jeremy Banner's motion for leave to amend its complaint to add a punitive damages claim. Because the Estate did not demonstrate Tesla met the required level of negligence for punitive damages, we reverse.

### *Background*

Jeremy Banner was driving a 2018 Tesla Model 3 southbound on US 441 in the early morning hours when a semi-trailer truck driver, turning left to head northbound on US 441, allegedly drove through a stop sign. Banner's vehicle struck the middle of the trailer. As his vehicle drove under the trailer, the top of his vehicle sheared off, killing him instantly.

A crash investigation revealed that about ten seconds before the collision, Banner activated two of the vehicle's "Enhanced Autopilot" features. First, he set the "Traffic Aware Cruise Control" ("TACC"), an adaptive cruise-control technology, at sixty-nine miles per hour. This was fourteen miles above the speed limit. Second, he engaged the vehicle's "Autosteer" feature. The Autopilot features remained activated until the collision but did not engage the vehicle's brakes. Nor did the vehicle detect any input on the steering wheel, brake, or accelerator in the eight seconds before the collision.

### i. The Estate's Allegations

Banner's Estate sued Tesla for strict liability and negligence in connection with the Enhanced Autopilot features. The Estate claimed that despite Tesla marketing and selling the Model 3 as a "state-of-the-art" automobile with a "full self-driving capability package," the vehicle lacked a sufficient crash avoidance system. This made the vehicle "unsafe for its intended and foreseeable use."

The Estate alleged TACC used forward-looking cameras and a radar sensor designed to determine when there is a vehicle ahead in the same lane. If the area in front is clear, TACC maintains the set driving speed. But "[w]hen a vehicle is detected, [TACC] is designed to slow down [the] Model 3 as needed to maintain a selected timed based distance from the vehicle in front, up to the set speed." The Estate alleged the vehicle lacked a "safe and effective automatic emergency braking safety feature" that other manufacturers had included in less expensive vehicles as early as the 2015 model year. It further alleged Tesla specifically knew that its product would not properly and safely avoid collisions with other vehicles and obstacles in its path, but Tesla failed to "make appropriate changes" to fix this defect. And it alleged Banner was unaware of this defect, which was not apparent by reasonable inspection.

In support of these allegations, the Estate identified eight similar incidents in which Tesla's Autopilot had been engaged but failed to prevent collisions that caused significant property damage, severe injury, and death. It also relied on an expert witness, Dr. Mary Cummings, who testified there were as many as twenty ways in which Tesla caused Banner's death.

### ii. The Estate's Proffer in Support of its Punitive Damages Claim

In its proposed second amended complaint, the Estate sought to add a claim for punitive damages. It alleged Tesla had "specific knowledge" its

product was defective and would not properly and safely avoid collisions, based on, among other things:

1. inadequate design, testing, and manufacture of Autopilot;
2. government investigations, recommendations, and National Transportation Safety Board and National Highway Traffic Safety Administration warnings; and
3. numerous prior incidents and accidents in which the product "completely failed," causing catastrophic damage.

The Estate's motion states that, despite this knowledge, Tesla did not correct its defective product. Instead, Tesla and its President and CEO issued public statements misleading the public (including Banner) as to the product's purported capabilities and safety. Tesla did so for financial gain, to gain market share, and to avoid bankruptcy.

Considering Tesla's "unreasonable" financial motivations, the "unreasonably dangerous" nature of the conduct, the "high likelihood" of injury resulting from the conduct, and that this conduct "result[ed] in" Banner's death, the Estate argued Tesla's conduct rose to the level of "intentional misconduct." Alternatively, the Estate argued Tesla's conduct rose to the level of "gross negligence," because it "was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights" of Banner and other people exposed to it. The Estate claimed either theory would support an award of punitive damages.

### iii. Tesla's Response

In response, Tesla argued Banner worked as a computer software engineer and was tech-savvy and intelligent. He was also familiar with auto mechanics and rebuilt and repaired his own vehicles. He was known as a computer and car "geek."

With his background in mind, Tesla noted that Banner purchased Enhanced Autopilot, an optional feature offering "Level 2" self-driving features on the six-level scale created by the Society of Automotive Engineers. SAE Level 2 means the vehicle offers some driver assistance tools, such as lane centering with adaptive cruise control at the same time, but these features cannot drive the vehicle autonomously. In fact, Banner declined to purchase the "Full Self Driving Capability" option, which promised customers the ability to use full self-driving when the feature became available.

3

Tesla argued Banner was repeatedly advised about the limitations of the Autopilot features and warned against misuse. The Model 3's Owner's Manual contained numerous directions and warnings concerning the TACC, providing in short that:

1. TACC is not a collision avoidance system;
2. Driver should always be prepared to take immediate action, at risk of serious injury or death;
3. Driver should never depend on TACC to adequately slow down the vehicle;
4. TACC should not be used where traffic conditions are constantly changing;
5. TACC cannot detect all objects, especially in situations when driving over 50 mph;
6. TACC can misjudge the distance from a vehicle ahead; and
7. TACC can cancel unexpectedly at any time.

The Owner's Manual also contained warnings regarding the Autosteer feature. And to activate Autosteer feature for the first time, Banner was required to agree to a user agreement and acknowledge the following message:

Autosteer is a driver assistance feature and does not make your vehicle autonomous. Please use it only if you will pay attention to the road, keep your hands on the steering wheel, and be prepared to take over it any time. Autosteer is designed for use on highways that have a center divider, clean lane markings, and no cross-traffic. It should not be used on highways that have very sharp turns or land markings that are absent, faded or ambiguous. Autosteer is currently in Beta, which we say to encourage a higher level of vigilance. If this were a computer or mobile phone, we would not refer to it as Beta, but we believe the standards are considerably higher for vehicle control and want to be clear about the proper use of Autosteer.

Further, each time a driver engaged Autosteer, the following message was programmed to appear on the car's display: "Please keep your hands on the wheel and be prepared to take over at any time."

### iv. The Circuit Court's Order Allowing the Estate to Seek Punitive Damages

After a hearing, the circuit court found entitlement to plead punitive damages, based on Tesla:

1. failing to modify its technology knowing the risk of cross traffic accidents, failing to adequately warn of the inability to detect cross traffic, and misrepresenting this technology in advertising;
2. failing to restrict a driver's ability to engage Enhanced Autopilot features to limited-access highways without cross traffic; and
3. using steering wheel torque, instead of a camera, to monitor driver inattentiveness.

Tesla's timely appeal followed.

### Analysis

"Punitive damages are imposed in order to punish the defendant for extreme wrongdoing and to deter others from engaging in similar conduct." *Chrysler Corp. v. Wolmer*, 499 So. 2d 823, 825 (Fla. 1986). In *Chrysler*, the car owner's wife died in the backseat when the car's fuel tank exploded after being rear-ended by another vehicle. *Id.* at 824. At trial, the jury returned a $3,000,000 punitive damage award against the car manufacturer. *Id.* The trial court vacated the jury's punitive damage award, but this Court reversed and remanded for its reinstatement. *Id.* The Florida Supreme Court quashed our opinion. *Id.* at 824, 827.

Our supreme court explained that it had previously "made it clear that the character of negligence necessary to sustain an award of punitive damages is the same as that required to sustain a conviction for manslaughter." *Id.* at 824 (citing *Carraway v. Revell*, 116 So. 2d 16, 20 (Fla. 1959)). And "a showing of even gross negligence, the degree of negligence that lies between ordinary negligence and willful and wanton conduct, is not enough." *Id.* (citations omitted). Instead, "the question that must be answered utilizing the *Carraway* standard is whether [the car manufacturer] exhibited a reckless disregard for human life equivalent to manslaughter by designing and marketing the [vehicle]." *Id.* at 825.

It is true that in 1999, after *Chrysler*, the Florida legislature amended the punitive damages statute, section 768.72, Florida Statutes, into its current form. But the Florida Supreme Court reaffirmed the applicability

of the *Carraway* standard. *See Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 11 (Fla. 2016) (citing *Carraway*, 116 So. 2d at 18-19) ("[T]his Court has recognized that the required level of negligence for punitive damages is equivalent to the conduct involved in criminal manslaughter.").

Applying that standard to this case, the question is whether Tesla engaged in gross negligence so egregious that it is equivalent to criminal manslaughter. The standard criminal jury instruction for manslaughter defines the level of "culpable negligence":

> [E]very person has a duty to act reasonably toward others. If there is a violation of that duty, without any conscious intention to harm, that violation is negligence. But culpable negligence is more than a failure to use ordinary care toward others. In order for negligence to be culpable, it must be gross and flagrant. Culpable negligence is a course of conduct showing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or such an entire want of care as to raise a presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard for the safety and welfare of the public, or such an indifference to the rights of others as is equivalent to an intentional violation of such rights.
>
> The negligent act or omission must have been committed with an utter disregard for the safety of others. *Culpable negligence is consciously doing an act or following a course of conduct that the defendant must have known, or reasonably should have known, was likely to cause death or great bodily injury.*

Fla. Std. Jury Instr. (Crim) 7.7 (emphasis added).

The record does not support a finding that Tesla knew, or reasonably should have known, that its SAE Level 2 driving assistance features were likely to cause death or great bodily injury. Instead, the evidence indicates Tesla's Autopilot features were "state-of-the-art" and complied with all industry and regulatory standards. Further, Tesla repeatedly warned against misuse of the features, which was industry practice. While the Estate's expert testified that Tesla is liable for gross negligence and intentional misconduct in "twenty ways," Tesla cannot be liable for failing to provide technology that it did not advertise and that did not exist.

6

After *Chrysler*, we recognized that "[i]t would appear that the Florida Supreme Court has all but eliminated punitive damage awards in products liability cases." *Jeep Corp. v. Walker*, 528 So. 2d 1203, 1205 (Fla. 4th DCA 1988). That remains largely true today. In this case, the Estate did not establish Tesla knew or should have known its SAE Level 2 driving assistance features were likely to cause death or great bodily injury. Therefore, the circuit court's order must be reversed.

### *Conclusion*

The circuit court's order allowing the Estate to amend its complaint to seek punitive damages is reversed.

*Reversed and remanded.*

LEVINE and FORST, JJ., concur.

*        *        *

**Not final until disposition of timely filed motion for rehearing.**